

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-75,617

**DARLIE LYNN ROUTIER, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPEAL IN CAUSE NO. F96-39973-J
### FROM THE CRIMINAL DISTRICT COURT NO. 3
### OF DALLAS COUNTY

PRICE, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, JOHNSON, KEASLER, HOLCOMB and COCHRAN, J.J., joined. WOMACK and HERVEY, J.J., concurred in the result.

### O P I N I O N

This is an appeal from an order denying the appellant's motion for post-conviction

DNA testing in a capital-murder case.[1]  We will vacate the convicting court's order and

---

[1]

Because the appellant was sentenced to death, direct appeal is to this Court.  TEX. CODE CRIM. PROC. art. 64.05.  (All subsequent references to Articles are to the Texas Code of Criminal Procedure unless otherwise specified.)

remand the cause for limited DNA testing, as specified in this opinion.

## PROCEDURAL POSTURE [2]

The appellant was convicted of stabbing her own son, Damon Routier, to death. Damon was younger than six years of age at the time.[3] Damon's older brother, Devon, was also stabbed to death. The appellant testified that she was sleeping on a couch in the family room in the downstairs of her home and that her sons were asleep on the floor in front of the television. She awoke to discover a stranger departing through the kitchen and utility room and out through the garage, leaving a bloody butcher knife from the kitchen behind on the utility room floor. She herself suffered a number of wounds, including a slash across her neck that came perilously close to severing her carotid artery. She denied having stabbed her sons. The State presented circumstantial evidence suggesting that there was no intruder, that the crime scene had been "staged," that the appellant had inflicted the wounds on herself, and that she had some pecuniary motive to murder her children. The jury found the appellant guilty of capital murder, and she was sentenced to death. We affirmed her conviction and

---

[2] The convicting court did not formally take judicial notice of the appellate record. However, in its order denying the appellant's motion for post-conviction DNA testing, the convicting court *did* indicate that it had considered "the evidence adduced at trial[.]" Because the current judge of the Criminal District Court Number 3, who ruled on the motion, was not the same judge who presided over that court at the time of trial, he could not have relied on personal recollection. He could only have considered the evidence adduced at trial by taking judicial notice of the appellate record. In any event, in resolving this appeal, we will take judicial notice of the appellate record which is in this Court's possession. TEX. R. EVID. 201(f); Steven Goode, Olin Guy Wellborn, III & M. Michael Sharlot, 1 TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE § 201.7 (2002 3d ed.), at 75.

[3] TEX. PENAL CODE § 19.03(a)(8).

sentence on direct appeal.[4]

After her conviction became final, but while her state post-conviction application for writ of habeas corpus was pending, the appellant filed a motion for post-conviction DNA testing under Chapter 64 of the Texas Code of Criminal Procedure. She requested the testing of certain biological materials the results of which she contends will bolster her claim that an intruder was in the house and undermine the plausibility of the State's evidence that the crime scene was "staged." The trial court found that the evidence that the appellant wished to test had been adequately preserved so that DNA testing was available and that the evidence had been maintained by a proper chain of custody.[5] In addition, there can be no question that the identity of the killer is in question.[6]

Nevertheless, the trial court ultimately denied the appellant's motion, finding against the appellant on two specific issues. First, the trial court concluded that the appellant had failed to establish by a preponderance of the evidence that the jury would not have convicted her if exculpatory results from the testing she now seeks had been presented to it during trial.[7] Second, the trial court made a finding of fact that DNA testing was available at the

---

[4] *Routier v. State*, 112 S.W.3d 554 (Tex. Crim. App. 2003).

[5] Article 64.03(a)(1)(A)(i) & (ii).

[6] Article 64.03(a)(1)(B).

[7] Article 64.03(a)(2)(A).

time of the appellant's trial and that the evidence she now seeks to have tested was either actually tested pretrial or else could have been tested at that time but was not.[8] In her appeal, the appellant challenges both bases for denying her motion.

The appellant lists nine items of evidence recovered from the scene that she contends she should now be allowed to test. She contends that, had the jury known of exculpatory results from the collective DNA testing of these various evidentiary items, it more likely than not would not have convicted her. The State argues that the appellant could and should have requested that at least some of these items be subjected to DNA testing at the time of trial. Before addressing the question of whether it is more probable than not that the appellant would not have been convicted had the results of the testing she now seeks been exculpatory, we deem it appropriate first to determine which of the nine items would qualify for post-conviction testing under the criteria of Article 64.01(b). Only those items that qualify for testing under these threshold criteria should be included in the collective calculus for determining whether the appellant would not have been convicted. We will therefore address the trial court's second holding first.

### ARTICLE 64.01(b)

### The Statute and Standard of Review

Under Article 64.01(b), a convicted person may request the convicting court to permit

---

[8] This appears to be a ruling that the appellant did not satisfy any of the criteria of Article 64.01(b).

forensic DNA testing of evidence containing biological material that was in the State's possession during trial if that evidence:

- was not previously subjected to DNA testing because DNA testing was not available;[9] or

- was not previously subjected to DNA testing because DNA testing was available, but not technologically capable of providing probative results;[10] or

- was not previously subjected to DNA testing, through no fault of the convicted person, for reasons that are of a nature such that the interests of justice require DNA testing;[11] or

- was previously subjected to DNA testing, but can be subjected to testing with newer testing techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test.[12]

If one or more of the items that the appellant wishes to subject to post-conviction DNA testing meet any of these criteria, the trial court may order such testing—but only if the appellant also satisfies other statutory predicates, including a showing, by a preponderance of the evidence, that she would not have been convicted if exculpatory results had been obtained from DNA testing of as many of the nine items as meet the Article 64.01(b)

---

[9] Article 64.01(b)(1)(A)(i).

[10] Article 64.01(b)(1)(A)(ii).

[11] Article 64.01(b)(1)(B).

[12] Article 64.01(b)(2).

criteria.[13]   In reviewing the trial court's ruling, this Court ordinarily gives "almost total deference" to the trial court's resolution of questions of historical fact and application-of-law-to-fact issues that turn on witness credibility and demeanor, but we consider *de novo* all other application-of-law-to-fact questions.[14]

## Preliminary Matters

Before getting down to the specifics of the appellant's claims with regard to the biological materials for which she seeks to obtain post-conviction DNA testing, we must first address several general matters that will inform our analysis of all of her claims.  We begin with the appellant's apparent assumption that she can invoke Article 64.01(b)(1)(B)'s no-fault provision to argue generally that she was not at fault for failing to obtain DNA testing simply because all of the biological materials were in the State's control.  The appellant was given access to all of the State's evidence, including biological evidence, prior to trial.  She does not allege or prove that she herself ever sought to obtain any of the biological material from the State, or any funding from the convicting court, for the specific purpose of conducting DNA testing using the technology that was available at that time.[15] Nevertheless, she broadly asserts that she cannot be faulted for her failure to seek any DNA testing at the

---

[13]   Article 64.03(a)(2)(A).

[14]   *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002).

[15]   The appellant was allowed to take cuttings from the night shirt prior to trial.  *See* note 46, *post*.  However, the record does not reveal that she ever attempted to obtain funding from the trial court to conduct DNA testing on those cuttings.

time of trial because the State had possession of all of the biological material and did not even reveal that it had conducted DNA testing until shortly before her trial commenced.[16] She seems to argue that this circumstance alone should be enough to satisfy the criteria of Article 64.01(b), thereby allowing her to obtain all of the testing she now seeks. We cannot construe the statute this way.

Post-conviction DNA testing under Chapter 64 pertains exclusively to testing of biological material that "was in the possession of the state during the trial of the offense[.]"[17] Thus, *any* request for post-conviction DNA testing under Chapter 64 will necessarily seek the belated testing of biological materials that were in the State's possession at the time of trial. In essence, the appellant argues that because the State possessed the biological materials, she can never be at fault for failing to seek DNA testing at the time of trial. And as long as a jury would not have convicted her had it been privy to the results of post-conviction DNA testing, she seems to maintain, the interests of justice will always require testing. For this reason, she argues, she should be allowed to obtain the post-conviction DNA testing under Article 64.01(b)(1)(B).

To accept the appellant's implied construction of Article 64.01(b)(1)(B), however,

---

[16]

*See*, *e.g.*, Appellant's Brief, at 33 ("Because [the appellant] had no control over the previous DNA testing selections and because the results of the DNA testing requested in the DNA motion will show by a preponderance of evidence that she would not have been convicted, the interests of justice dictate that DNA testing should be performed. TEX. CODE CRIM. PRO. ANN. art. 64.01(b)(1)(B).").

[17]

Article 64.01(b).

would thwart the obvious legislative intent. It would relieve all post-conviction DNA movants from any obligation ever to seek DNA testing under technologies available at the time of trial, as contemplated by Subsections (b)(1)(A)(i) and (b)(1)(A)(ii). Because the biological materials the movant seeks to subject to post-conviction testing under Chapter 64 were, by definition, in the State's possession at the time of trial, movants could always invoke the no-fault provision of Subsection (b)(1)(B) to obtain post-conviction DNA testing and never have to resort to Subsections (b)(1)(A)(i) and (b)(1)(A)(ii). In other words, the appellant's construction would effectively nullify whole portions of the statute, contrary to the rules of statutory construction.[18] We reject such a reading of the statute. In the specific analyses that follow, we will require the appellant to make a more particularized showing of the absence of fault whenever she invokes Article 64.01(b)(1)(B).

The second preliminary matter to which we must attend is a latent ambiguity in the statute, the resolution of which will often determine which provision of Article 64.01(b) will apply. Article 64.01(a) provides for forensic DNA testing of "evidence containing biological material." In the instant case, there are several items of evidence that were admitted at trial that contained multiple samples of "biological materials" capable of providing different results. The appellant wishes to test multiple blood stains from a tube sock, a night shirt, and

---

[18]

"In enacting a statute, it is presumed that . . . the entire statute is intended to be effective[.]" TEX. GOV'T CODE (CODE CONSTRUCTION ACT) § 311.021(2). The Code Construction Act applies to amendments to the Code of Criminal Procedure, including Chapter 64, enacted after the 60th Legislature. *Id*. § 311.002(2); *Ex parte Torres*, 943 S.W.2d 469, 473 n.5 (Tex. Crim. App. 1997).

a butcher knife. Is the "evidence containing biological material" the sock, night shirt, or knife? Or does the statute contemplate that the "evidence containing biological material" should be considered the individual blood stains on those evidentiary items? The answer is critical, for it determines whether the criteria in Article 64.01(b)(1) (governing whether "evidence" *not* previously subject to DNA testing may be subjected to post-conviction DNA testing) or (b)(2) (governing whether "evidence" that *was* previously subjected to DNA testing may be *retested*) will apply. For example, with respect to the tube sock, the appellant seeks both to subject specific blood stains that have already been tested to new testing, and to test other blood stains on the tube sock that have never been tested before. If the "evidence containing biological material" is construed broadly to be the tube sock, then both requests should be governed by Article 64.01(b)(2). But if, instead, the "evidence containing biological material" is deemed to be the individual blood stains appearing on the tube sock, then the appellant's request for retesting will be governed by Article 64.01(b)(2), while her request for new testing will be governed by Article 64.01(b)(1).

We think the latter understanding is more consonant with the apparent legislative intent.[19] It is clear that the Legislature meant to require defendants to avail themselves of whatever DNA technology may be available at the time of trial. Otherwise, there is no ready explanation for the distinction between Article 64.01(b)(1)(A)(ii) (evidence *not* previously

---

[19] In construing Chapter 64, as with any other statute, we seek to effectuate the legislative intent; and if the statute is not plain on its face, we may look to other indicia of that intent. *Kutzner v. State*, 75 S.W.3d 427, 433 (Tex. Crim. App. 2002).

tested may be subjected to post-conviction DNA testing if technology at the time of trial not capable of providing probative results) and Article 64.01(b)(2) (evidence that *was* previously tested may be retested if newer technology would yield more accurate and probative results). The Legislature could have chosen to draft a statute that would permit post-conviction testing any time the technology improves enough to enhance accuracy and probative value, regardless of whether either party had previously obtained available DNA testing. But it plainly did not. If all of the blood stains on the tube sock (or night shirt or butcher knife) were amenable to DNA testing at the time of trial, then the appellant should not be able to avail herself now of the benefits of post-conviction DNA testing simply because some of those stains were tested by the State and the technology has since improved. As long as it would have been apparent to the appellant at the time of trial that the other individual blood stains on the tube sock (or night shirt or butcher knife) would (or even might) have discrete and independent probative value, the overall import of the statute mandates that she seek such testing at that time, or forego testing later. Accordingly, we construe "evidence containing biological material" to mean individual samples of biological material, even if taken from the same physical object or source, that have (or may conceivably have) discrete and independent probative value for purposes of the particular issues at trial.[20]

---

[20]

    If this seems harsh, it should be remembered that the Legislature has included a fail-safe provision in the statute. A defendant may still be able to invoke Article 64.01(b)(1)(B) to obtain post-conviction DNA testing if he can demonstrate that the incremental probative value of testing a discrete item of biological material was not reasonably apparent at the time of trial, that the failure to seek DNA testing at the time of trial was therefore not his fault, and that the interests of justice

The third preliminary matter that we must address is an apparent misconception harbored by the convicting court, as suggested by its order denying the appellant her request for post-conviction DNA testing. In its order, the convicting court "finds that DNA testing was available at the time of [the appellant's] trial and that the evidence was either tested or could have been tested at the time of trial."[21] This finding of fact is accurate insofar as it goes. But it is not dispositive of the appellant's various claims that she has satisfied the criteria of Article 64.01(b). Under that provision, as set out above, the appellant may well be entitled to retest certain biological material *even if* it was already subjected to DNA testing at trial,[22] and she may also be entitled to test other biological material even though it *could* have been, but was not, tested at the time of trial.[23] Because the convicting court misconstrued or failed to apply the proper criteria for obtaining post-conviction DNA testing under Article 64.01(b), we will review the question whether the appellant has met those particular criteria *de novo*, notwithstanding the convicting court's fact finding.

**The Tube Sock**

A tube sock was recovered in an alley behind, and a few houses down from, the

now require post-conviction testing.

[21] There is no express conclusion of law in the convicting court's order that corresponds to this fact finding.

[22] *See* Article 64.01(b)(2).

[23] *See* Article 64.01(b)(1)(A)(ii) and (b)(1)(B).

appellant's home. It contained the boys' blood and other biological materials. The appellant's position was that the sock must have been left there by the unknown intruder as he fled the crime scene. The State's theory was that the appellant planted the sock there to make it appear as if an intruder had fled down the alley.

The appellant wants to conduct three tests with relation to the tube sock. First, she asks that human limb hairs found on the tube sock be subjected to Short Tandem Repeat (STR) DNA testing (if the hair retains its root) or mitochondrial DNA testing (if it does not). She claims that, "[d]ue to more discriminating testing techniques, it is likely that DNA results that were unrecoverable in 1996 may be obtained from this evidence today."[24] She refers us to the affidavit of her expert, Dr. Elizabeth Johnson, a forensic DNA analyst. The appellant does not claim that the limb hairs were previously tested. The question, therefore, is whether any previously available method of DNA testing was not technologically capable of providing probative results.[25] In her affidavit, Dr. Johnson nowhere asserts that DNA results were "unrecoverable in 1996" using the technology then available. She simply asserts that "advances in DNA testing since 1996 make testing . . . likely to yield more probative results if tested today." For items not previously subjected to DNA testing, the standard is not whether previous technology would yield *more* probative results, but whether it was capable of yielding any probative results at all. The appellant was not entitled to subject the limb

---

[24] Appellant's Brief, at 34.

[25] Article 64.01(b)(1)(A)(ii).

hairs to post-conviction DNA testing.

Second, the appellant speculates that the tube sock might have been used to gag her and might therefore contain additional biological material in the form of saliva. According to Dr. Johnson, the sock could have been subjected to a procedure known as amylase mapping to determine the possible presence of saliva, which, if found, could have been subjected to DNA analysis. The appellant complains that the State did not have the sock tested for the presence of saliva, and therefore, through no fault of hers, the DNA testing was not done.[26] However, the appellant has failed even to establish that there is any biological evidence on the sock in the form of saliva. The appellant herself never sought to have the amylase mapping procedure performed prior to trial. Nothing in Chapter 64 entitles her to have it performed now as a predicate to seeking post-conviction DNA testing. Thus, she fails to meet her threshold burden of showing that there is even any "evidence containing biological material" to be tested.[27]

Third with respect to the tube sock, the appellant seeks to retest blood stains that were already subjected to DNA testing by the State prior to trial. Six blood stains from the sock were tested in all. Three of the stains matched Devon's DNA and two matched Damon's. One of the stains yielded no results. In addition, she seeks to test other blood stains on the

---

[26] Thus she seems to invoke Artcile 64.01(b)(1)(B).

[27] Article 64.01(a) ("A convicted person may submit to the convicting court a motion for forensic DNA testing of evidence containing biological material.").

sock that were not previously tested.

As for the stains that were tested and did yield a result, the appellant must show that new testing techniques will provide a reasonable likelihood of results that are more accurate *and* probative than the results of the previous tests.[28] It may well be that the new testing techniques would yield more *accurate* results, in the sense that they may have a higher power to exclude potential DNA donors. But on the facts of this case, the appellant has not shown a reasonable likelihood that those results would prove more *probative*.[29] Given the volume of blood at the scene that came from Devon and Damon, it seems most improbable that newer, albeit more accurate, DNA testing would now exclude them as donors.[30] While such a result is remotely possible, the reasonable likelihood is that new testing will only confirm the results of the old testing, albeit with greater accuracy.[31] At least under these

[28]

Article 64.01(b)(2).

[29]

Under Article 64.01(b)(2), the new testing technique must be capable of yielding a result that is "more accurate and probative" than the old technique. In construing statutory language, we presume that every word has been used for a purpose and should be given effect if reasonably possible. *E.g.*, *State v. Hardy*, 963 S.W.2d 516, 520 (Tex. Crim. App. 1997).

[30]

There can be little doubt that the sock came from the appellant's home. It was also shown at trial that further DNA testing of non-blood biological evidence from the toe of the sock yielded "a very faint typing matching the D1S80 type of" the appellant, suggesting that at some point she had worn it. With all the blood from the boys at the crime scene, it is hardly surprising that the DNA testing of the blood samples on the sock yielded results consistent with Devon and Damon.

[31]

Chapter 64 does not require us to assume that the results of new testing would prove exculpatory in making the threshold determination, under Article 64.01(b)(2), whether new testing techniques would be more probative than old techniques.

circumstances, the appellant has not shown the new testing to be more probative, and she is therefore not entitled to it.

Turning to the one stain that was tested before trial but did *not* yield a result, the question again is whether newer testing techniques would provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test.[32]  The State points to testimony at trial from Judith Floyd, the forensic laboratory supervisor at Gene Screen, that "it's not uncommon" not to get a result from a particular stain, but that "using the D1S80 technique," which was one of the technologies available at the time of trial, "if you retype the specimen, it's very likely you could get a result." In her second affidavit accompanying the appellant's motion, Dr. Johnson counters that current "clean up" procedures, which are an improvement over the "clean up" techniques available in 1996, would make it more likely that retesting would yield a result.[33]  We think that such "clean up" procedures fall within the ambit of the statutory reference to "newer testing techniques" in

---

[32]  Article 64.01(b)(2).

[33]  According to Dr. Johnson:

> DNA "clean up" procedures are available today that were not in 1996. Inhibitors of the enzyme that drives the PCR amplification process are often encountered in forensic samples, and although some techniques were utilized in 1996 to overcome this problem, these techniques were not always utilized by all laboratories and when they were, success was variable.  Technology has advanced considerably in this area, and several commercially available products are available today such as DNA IQ by Promega and Quiagen columns.  Using a procedure such as these has proven to significantly improve amplification of extracted DNA that previously gave a "no result" due to the presence of inhibitors.

Article 64.01(b)(2). Even if retesting with the old DNA testing techniques would likely have yielded a result, if no results were in fact obtained through the old testing and the likelihood of obtaining a result is significantly enhanced by the newer "clean up" techniques, we think that the appellant has satisfied Article 64(b)(2).[34]

The appellant also submits that she should be permitted to conduct post-conviction DNA testing on the remaining, previously untested blood stains on the tube sock because that testing can now be accomplished utilizing the newer "clean up" techniques. But any evidence *not* previously subjected to DNA testing may not be subjected to post-conviction DNA testing unless DNA testing was either completely unavailable at the time of trial or was available but not technologically capable of providing probative results.[35] As we have already noted, evidence that has *not* been previously tested for DNA cannot be subjected to post-conviction testing simply because new techniques become available that would yield "more accurate and probative" results.[36] Efficacious DNA testing was obviously available at the time of trial to test the remaining blood stains, since five of the blood stains on the sock

---

[34] In this context it is important to note that, unlike Article 64.01(b)(1)(B), Article 64.01(b)(2) contains no "fault" provision. Therefore, the fact that the appellant failed to seek retesting under the old testing techniques does not prevent her from obtaining new testing now if the technology for preparing DNA samples for testing has significantly improved in the interim, making it more likely than before that the testing will yield results. Any results will be "more accurate and probative" than no results at all.

[35] Article 64.01(b)(A).

[36] Only biological evidence that *was* previously tested is subject to post-conviction retesting under this standard. Article 64.01(b)(2).

were in fact successfully tested. Therefore, the provisions of Article 64.01(b)(1)(A) do not apply. Whether the appellant may obtain post-conviction testing depends, then, upon whether she has shown that they were not previously subjected to DNA testing through no fault of her own, and that the lack of previous testing was "for reasons that are of a nature such that the interests of justice require DNA testing."[37] But the appellant does not even attempt to argue that she can satisfy this provision (other than her general no-fault argument, which we have already rejected). She has therefore failed to show that she is now entitled to conduct post-conviction DNA testing on the previously untested blood stains on the tube sock.

## Coffee Table Blood

The police recovered a latent palm print on a glass-top table in the family room where the murders occurred. The print was embedded in dried blood. The State's fingerprint examiner at trial was unable to match the palm print for lack of a sufficient number of points of comparison, but did express the opinion that, because of the size of the ridge detail, he believed the print belonged to a juvenile or possibly a five- or six-year-old child.[38] The appellant claims that the State has since "abandoned" its position that the palm print probably belonged to one of the children, and that subsequent fingerprint examinations conducted

---

[37] Article 64.01(b)(1)(B).

[38] The Dallas County Medical Examiner released Devon's and Damon's bodies for burial without first taking their palm prints.

pursuant to her initial post-conviction application for writ of habeas corpus have revealed that the palm print belonged to none of the adults in the Routier household.[39] On the assumption that the palm print must therefore belong to the unknown intruder, the appellant argues that the blood should be tested for the presence of male DNA. She does not claim that the blood itself will likely be shown to belong to the unknown male intruder, but that, because the palm print is likely his, there could be biological material such as oil from his hand mixed with the blood. Dr. Johnson avers that newer DNA testing techniques, specifically Y-chromosome STR testing, "could be especially useful in determining whether a male DNA profile is present that is unrelated to the Routier male lineage."

Even entertaining the appellant's factual assumptions about the palm print, we find that she is not entitled to the DNA testing she presently seeks. The appellant does not indicate whether the dried blood in which the palm print is embedded has ever been subjected to DNA testing. In the absence of any indication in the record that it has,[40] we must apply

---

[39] The appellant does not cite any place in the record where the State has "abandoned" its position at trial, nor can we find any such abandonment in the record. The convicting court concluded during the initial state habeas proceedings that the State's trial expert made an accurate assessment of the probable source of the palm print, and this Court expressly adopted its findings of fact and conclusions of law in denying the appellant habeas corpus relief.

[40] According to a report from the Southwest Institute of Forensic Science (SWIFS), dated November 1, 1996, which is attached to the appellant's pleading, "flakes" from a "coffee table" were submitted for DNA testing. The appellant was found to be a potential contributor, while her husband and two children were excluded as contributors. There is no mention of another possible contributor. The appellant does not allege that this biological material (assuming it was blood) came from the same coffee table (there were more than one) on which the bloody palm print was discovered, and we can find no basis in the record before us to conclude that it was.

the criteria in Article 64.01(b)(1)(A)(ii), which requires the appellant to show that previously available DNA testing was not technologically capable of providing probative results.[41] Dr. Johnson does not assert that the DNA technology in existence at the time of trial could not distinguish multiple DNA sources from a single biological sample—indeed, many of the samples that were tested for trial from various biological materials were shown by DNA technology extant in 1996 to contain mixtures of the appellant's and her sons' DNA.[42] Dr. Johnson now asserts only that the present-day DNA technologies would do a better job. We reiterate: That is the standard for determining whether biological materials that *have* been previously subjected to DNA testing may *again* be tested. The appellant has failed to establish that she is entitled to conduct post-conviction DNA tests of the bloody palm print.

## Pubic Hair

At trial, the DNA analyst from Gene Screen testified that she tested a pubic hair, which contained a root, but was unable to obtain any results.[43] Because the pubic hair was

---

[41] Again, the appellant does not specifically argue that the failure to subject the bloody palm print to available DNA testing at the time of trial was through no fault of her own, or that the interests of justice require that it be tested. For this reason we do not apply Article 64.01(b)(1)(B).

[42] A forensic serologist testified at trial that in the event of a mixture of biological materials, "the DNA analyst would be able to pick up both blood types." And indeed, when Gene Screen subjected biological materials from the appellant's night shirt and the apparent murder weapon to DNA testing, it was able to discern both the appellant's and her sons' DNA in some of the samples.

[43] The appellant makes various allegations about where the pubic hair was discovered (*e.g.*,"in the kitchen," "in the vicinity of [the] living room"), but cites to nowhere in the appellate record that reveals where it actually came from. Nor can we determine where it was found from our review of the appellate record. The closest the record comes to revealing where the pubic hair was found is

previously subjected to DNA testing, the standard is whether newer techniques would be reasonably likely to yield more accurate and probative results.[44]  Given the improved "clean up" technologies described in Dr. Johnson's affidavit, we think the appellant has shown that they would.

**Night Shirt**

The bloody night shirt that the appellant wore on the night of the offense was subjected to extensive DNA testing.  The results showed a D1S80 type that was consistent with the appellant's on many of the stains that were tested.  Other stains were consistent with Damon's or Devon's type, while still others showed a mix of the appellant's and Damon's or Devon's type.  No other D1S80 type was revealed.  The State presented an expert on blood pattern analysis who testified that some of blood found on the night shirt was consistent with "cast off" blood from the appellant's acts of stabbing both Devon and Damon.

The appellant now asks to be able to subject other areas of the night shirt to DNA testing.  She raises two justifications.  First, she claims that the State did not establish a sufficient number of blood stains to establish a "cast off" pattern with respect to Damon.  Additional testing, she contends, would, as Dr. Johnson describes it, "support or refute the

an awkward question from defense counsel to the DNA analyst from SWIFS that seems to assume that it was found in the "den."  A Gene Screen report that is attached to the appellant's motion, dated January 7, 1997, indicates that the DNA analyst who actually tested the pubic hair obtained it from the SWIFS trace evidence analyst on November 21, 1996, but was unable to obtain a D1S80 type.

[44]  Article 64.01(b)(2).

State's claims that the stains" represent "cast off" blood. In essence, the appellant seeks to test other blood stains on the night shirt that have never been previously subjected to DNA testing. She therefore must satisfy one of the criteria in Article 64.01(b)(1). But she has neither alleged nor proved that the 1996 DNA technology was incapable of providing probative results for other blood stains on the night shirt.[45] Further, she has not shown that the failure to seek DNA testing under the technology available at the time of trial was not her fault.[46]

Second, the appellant speculates that there could be blood from the unknown intruder on the night shirt that could be mixed with the high volume of blood on the shirt that

---

[45] Article 64.01(b)(1)(A)(i).

[46] Article 64.01(b)(1)(A)(ii). Elsewhere in her brief, the appellant generally alleges that, because the State did not disclose the results of its own DNA testing until "shortly before her trial," Appellant's Brief, at 14, she cannot be faulted for failing to seek DNA testing of her own. It could perhaps be argued (although the appellant does not make this argument specifically with respect to the night shirt) that the appellant could not have known until this time that it was necessary to conduct further testing on the night shirt in order to refute the State's "cast off" theory. But the appellant received a copy of the SWIFS report in the latter part of November, 1996, which contained results of preliminary DNA testing on the night shirt. The first Gene Screen report is dated December 2, 1996. It reflects that eighteen blood stains from the night shirt were analyzed. The first day of the guilt phase of trial was January 6, 1997, more than a month later. At that time, the appellant requested a one-day continuance, citing, among other things, the fact that the State was subjecting *additional* blood stains from the night shirt to DNA testing. The trial court denied the continuance. A second Gene Screen report was issued the next day, January 7, 1997, reflecting that at least six additional blood stains were analyzed. The appellant never renewed her request for a continuance. Moreover, well in advance of trial, before the State conducted any DNA testing of the night shirt, the appellant was allowed to take cuttings of her own choosing from the night shirt for whatever forensic analysis she deemed appropriate. To date, the record does not reveal the results of any testing the appellant may have conducted.

obviously came from her own wounds.[47]  She argues, based upon Dr. Johnson's affidavits, that new DNA technologies, particularly the Y-chromosome STR technique, can better differentiate male from female DNA in a mixed sample.  It is unclear to us whether the appellant wishes to test hitherto untested areas of the night shirt, or to retest areas of the night shirt that have been previously tested and shown to contain the appellant's D1S80 type.  She is not entitled to test the former without either a showing that the previous technology was incapable of distinguishing DNA from more than one contributor to a single sample,[48] or an allegation and showing of no-fault.[49]  Obviously, the previous technology was at least rudimentarily capable of detecting and distinguishing mixed contributors, since Gene Screen was able to identify mixtures of the appellant's DNA and that of her sons.[50]

On the other hand, to the extent that the appellant wishes to retest those biological samples that the State had tested at the time of trial, she need only demonstrate that the newer Y-chromosome STR technology provides a reasonable likelihood of results that are more

---

[47] Dr. Johnson opines that "perpetrators often cut themselves during the act of stabbing their victims."  There is no independent evidence from the trial record to indicate that an unknown intruder may have cut himself.  For example, investigators found no blood trail leaving the house that might have suggested a fleeing and wounded intruder.

[48] Article 64.01(b)(1)(A)(i).

[49] Article 64.01(b)(1)(A)(ii).

[50] Though the appellant's original trial attorneys obtained their cuttings from the night shirt prior to trial, *see* note 46, *ante*, she makes no allegation that she was denied the opportunity to subject those samples to DNA testing herself to look for the DNA of the unknown intruder.

accurate and probative than Gene Screen's results. Dr. Johnson maintains that Gene Screen's 1996 testing of the samples from the night shirt "was limited in nature in that it only utilized the D1S80 test which was not as sensitive as today's STR tests in detecting mixtures of DNA, nor was it as informative in power of discrimination." This demonstrates that the newer technology is reasonably likely to turn up evidence of an unknown intruder's DNA that the technology extant in 1996 may not have. The appellant should be permitted to retest those samples of the night shirt that the State has already subjected to DNA testing.

## Facial Hair

A facial hair was recovered somewhere at the scene.[51] Gene Screen subjected the hair to DNA testing using the D1S80 typing technique, and it excluded as potential contributors the appellant, her husband, and her children. On the assumption that it must belong to the unknown intruder, the appellant seeks to retest the facial hair utilizing the newer, more discerning technology in order to compare the results to DNA testing of other biological evidence she seeks to have tested, to show that it all belongs to the same unknown party. Because she has shown that the facial hair can now be subjected to a newer DNA testing technique that provides a reasonable likelihood of obtaining results that are more accurate and probative than the older DNA testing technology,[52] the appellant is entitled to subject it

---

[51] As with the pubic hair, the record does not reveal exactly where in the house the facial hair came from. The Gene Screen DNA analyst testified that she believed it was recovered from a rug, but could not say where the rug had been in the house.

[52] Article 64.01(b)(2).

to post-conviction DNA testing.

## Butcher Knife

Four areas of blood from the butcher knife, the apparent murder weapon, were tested. Two of the areas yielded results showing the appellant's DNA. Another showed Damon's DNA. The last showed a mixture of the appellant's and Damon's DNA. The appellant points to the fact that not every area of the knife that had blood on it was tested, and that the knife might also contain trace amounts of the unknown intruder's blood. Thus, the appellant now seeks testing of areas of the knife that were not previously subjected to DNA testing. Without specifically addressing the issue of fault, she argues that the remaining areas of blood on the knife should now be subjected to newer DNA testing techniques "in the interests of justice."[53]

However, she made no argument to the convicting court, and presented no evidence to show, that she was not at fault for failing to assure that every relevant area of the knife containing biological evidence was subjected to DNA testing using the technology that was available at the time of trial. That technology was plainly sufficient to provide probative results, since Gene Screen was able to obtain results for every sample of blood from the knife that it did test. If the appellant thought it was important at the time of trial to subject other portions of the knife containing biological materials to DNA analysis, she could have attempted to do so. The appellant cannot now obtain testing "in the interests of justice" using

---

[53] Thus, she seems to invoke Article 64.01(b)(1)(B).

newer technologies when she apparently made no effort at the time of trial to utilize the technology then available.

## Rape Kit

There is some intimation in the trial record that the appellant was sexually assaulted by the unknown intruder and that there may have been a partial rape kit performed on her when she was transported to the hospital.[54] At present, however, the appellant has provided no concrete evidence that such an examination was actually done,[55] or, if it was, that any biological material that may have been recovered was retained. As with the claim of saliva on the tube sock, the appellant fails to meet her threshold burden of showing that there is even any "evidence containing biological material" to be tested.[56]

## Pillows

There were a number of pillows on or around the couch upon which the appellant slept. Two blood stains from one of the pillows were subjected to DNA testing by Gene Screen, yielding a D1S80 type that was consistent with the appellant. In her brief, the

---

[54]

When she had fallen asleep on the couch, the appellant was wearing panties. As she was being loaded into the ambulance to go to the hospital, she was no longer wearing them, and they were never recovered. She also testified to a vague recollection of feeling "pressure" on her right leg as she was waking up. She told one of the nurses that she had felt "a pressure down there."

[55]

A police officer during a pretrial hearing testified that a rape kit was done. But, as even the appellant acknowledged in a letter brief to the convicting court dated June 30, 2006, that police officer "now recalls that a rape kit was discussed but never performed."

[56]

Article 64.01(a).

appellant claims that "the interests of justice and the fact that new testing methods are now available dictate testing additional stains which could reveal the DNA of the unidentified intruder that have not been previously tested on the pillow."[57] The appellant made no request, however, to have the pillow subjected to additional DNA testing under the technology extant in 1996, even though that technology was plainly capable of providing probative results.[58] While she claims that the interests of justice require post-conviction testing, she does not specifically allege, much less prove, that the previous failure to test other blood stains on the pillow was through no fault of her own.[59]

**Blood Flakes on Garage Door**

SWIFS conducted DQ alpha DNA testing upon a biological sample, denominated "Flakes in film canister labeled, 'garage door outside.'" No human DNA was detected using this technology. The appellant now claims that the flakes were dried blood recovered from the door leading from the utility room out into the garage. An exhibit was admitted at the time of trial that does indeed show blood on the garage side of this door. The appellant now argues that the flakes that were previously tested by SWIFS should be retested using the more modern DNA testing techniques. Because the flakes were previously subjected to DNA

---

[57] Appellant's Brief, at 38.

[58] Article 64.01(b)(1)(A)(ii).

[59] Article 64.01(b)(1)(B).

testing, the appellant must establish that newer testing techniques are available that provide a reasonable likelihood of results that are more accurate and probative than the DQ alpha testing.[60] She has shown through Dr. Johnson's affidavit that with the newer STR testing technique, along with the improved "clean up" technology, there is a reasonable likelihood of obtaining more accurate and probative results.

## Summary

In our *de novo* review, we have concluded that the appellant has satisfied the criteria under Article 64.01(b)(2) for conducting post-conviction DNA testing, using present-day technologies, of the following biological materials:

- one blood stain on the tube sock, previously tested but yielding no results;

- the pubic hair, previously tested without results;

- previously tested blood stains from the night shirt;

- the facial hair;

- flakes from the door from the utility room to the garage, previously tested without results.

Before the appellant may be permitted to subject these biological materials to post-conviction DNA testing, however, it is still incumbent upon her to establish by a preponderance of the evidence that, assuming those tests produce exculpatory evidence, the jury would not have

---

[60] Article 64.01(b)(2).

convicted her in light of this additional, exculpatory evidence.[61] This is an issue we always review *de novo*,[62] and we turn to that analysis next.

## ARTICLE 64.03(a)(2)(A)

Article 64.03(a)(2)(A) was amended in 2003; the amendment applies to any motion for post-conviction DNA testing filed after its effective date of September 1, 2003.[63] The appellant filed her motion for post-conviction DNA testing in November of 2003. Under the amended provision, "[t]he defendant must prove that, had the results of the DNA test been available at trial, there is a 51% chance that the defendant would not have been convicted."[64] For purposes of this inquiry we must assume (without deciding, of course) that the results of all of the post-conviction DNA testing to which the appellant is entitled under Article 64.01(b) would prove favorable to her. We must then determine whether there is a greater than 50% chance that the appellant's jury would not have convicted her had it been aware

---

[61] Article 64.03(a)(2)(A) ("A convicting court may order forensic DNA testing under this chapter only if . . . the convicted person establishes by a preponderance of the evidence that . . . the person would not have been convicted if exculpatory results had been obtained through DNA testing[.]").

[62] *Rivera v. State*, *supra*, at 59.

[63] *See* Acts 2003, 78th Leg., ch. 13, § 3, p. 16, eff. September 1, 2003.

[64] *Smith v. State*, 165 S.W.3d 361, 364 (Tex. Crim. App. 2005), *quoting* House Criminal Jurisprudence Committee, Bill Analysis, Tex. H. B. 1011 78th Leg., R.S. (2003). *See also Prible v. State*, 245 S.W.3d 466, 467-68 (Tex. Crim. App.) ("Under Article 64.03, a defendant is not entitled to DNA testing unless he first shows that . . . there is a greater than 50% chance that he would not have been convicted if the DNA testing provided exculpatory results[.]").

of those presumptively favorable test results.

The facial hair and the pubic hair, by themselves, do not prove much, even if post-conviction DNA testing were to reveal that they came from the same unknown source. The record does not clearly reveal where in the house they were found, and there is no way to know for sure when they may have been deposited. However, when we combine the presence of the hairs with the blood evidence, a clearer circumstantial picture begins to emerge corroborating the appellant's story of an unknown intruder. Blood from an unknown third party male on the tube sock, the night shirt (mixed with the appellant's own blood), and on the outer part of the door leading from the utility room to the garage—especially if it can be said that the blood was contributed by the same unknown party who left the facial and pubic hairs—places that unknown party at the scene at the time of the killings, and supports the appellant's account that he fled through the utility room and out of the house by way of the garage. Such substantial corroboration of the appellant's exculpatory account would have a strong tendency to engender a reasonable doubt in an average juror's mind.

This is not to say that the inculpatory evidence was insubstantial, much less legally insufficient. There is no lack of evidence to support the State's theory that the appellant murdered her children and then staged the scene to try to make it look like the culprit was an unknown intruder. Some of the more significant circumstances that call into question the appellant's story, as highlighted in the State's brief, include:

- twice the appellant seemed to make a point of volunteering to first responders at the scene that she had handled the murder weapon and

thereby "had probably ruined any prints the intruder may have left";[65]

- although the appellant claimed the intruder escaped through the garage, no blood trail could be found beyond the utility room, and the motion sensor in the backyard was apparently never triggered;[66]

- there was relatively little overturned furniture or property damage, and valuable jewelry was found on a counter top between the kitchen and family room, belying the appellant's claim that she struggled with the intruder and suggesting "a proprietary interest" in the house and its contents that is inconsistent with a home invasion;[67]

- the blood and other circumstantial evidence at the scene did not corroborate the appellant's account that after the intruder cut her as she lay on the couch, she followed him through the kitchen and found the butcher knife on the utility room floor;[68]

- the appellant's night shirt had "cast off" stains of the boys' blood, suggesting she had stabbed them;[69]

- the house would not have been an inviting target for a home invader, and nobody actually saw an intruder leave the scene[70]

- there was some evidence (although contested) that the appellant and her husband were having financial difficulties, and life insurance policies for the boys in the amount of $5,000 apiece were found in a folder not

---

[65] State's Brief, at 3.

[66] *Id*. at 4.

[67] *Id*. at 4-5.

[68] *Id*. at 5-7.

[69] *Id*. at 7.

[70] *Id*. at 8.

far from the couch;[71]

- the appellant's demeanor and behavior in the aftermath of the murders were arguably "nothing like a grieving mother";[72] and

- the appellant gave varying accounts of the incident and her assailant to investigators and friends.[73]

The circumstantial evidence most detrimental to the appellant's account of an unknown intruder involved a window screen in the garage that had been cut open. The State's argued that the appellant cut the screen herself to make it appear to be the intruder's means of ingress and egress. A bread knife was found in the knife block on the kitchen counter from which a trace evidence analyst observed microscopic residue from the cut screen. It is highly implausible that an unknown intruder would have somehow gained entry to the house, stolen the knife, exited the house, cut the screen, and then entered the house again, making sure to return the knife to the block before attacking the appellant and her children.

On the other hand, the State's theory is hardly unassailable. As the appellant points out in her brief,[74] it would have been difficult for her to have staged the scene as the State contends, in the order in which she would have had to proceed, and in the limited time she

---

[71] *Id*. at 9.

[72] *Id*. at 9.

[73] *Id*. at 10.

[74] Appellant's Brief, at 12-13.

would have had to do it. Even crediting the State's own evidence in the case, the jury was confronted with two competing theories of what happened in the house that night, neither of which is wholly consistent with the circumstantial evidence.

We think that adding DNA evidence that would corroborate the appellant's account of an unknown intruder to the evidentiary mix could readily have tipped the jury's verdict in the appellant's favor. In our estimation, DNA evidence showing that an unknown intruder—indeed, the same unknown intruder—had left blood on the night shirt and the door from the utility room to the garage, along with a facial hair and a pubic hair, would more likely than not have caused the jury to harbor a reasonable doubt as to the appellant's guilt and decline to convict her.

The State argues that the presence of an unknown person's DNA could not have changed the jury's verdict because "it would not refute the evidence physically linking appellant to the murders and to the manipulation of the evidence at the scene. At a minimum, appellant would undoubtedly have been convicted as a party."[75] We disagree. The State's circumstantial evidence tending to show that the appellant manipulated the scene is not so compelling that the jury would more likely conclude beyond a reasonable doubt, when confronted with DNA evidence corroborating the appellant's story of an unknown intruder, that she was an accomplice (or had an accomplice) to the murder of her own children. There is at least a 51% likelihood that the jury would have seen her as a victim herself—or at least

---

[75] State's Brief, at 32, *citing*, *e.g.*, *Wilson v. State*, 185 S.W.3d 481 (Tex. Crim. App. 2006).

that it would have harbored a reasonable doubt that she was not.[76]

Accordingly, we hold that the convicting court erred in failing to allow at least the limited DNA testing that was permissible under Article 64.01(b). The convicting court's order is therefore vacated and the cause is returned to the convicting court for further proceedings, consistent with this opinion, under Chapter 64.

Delivered:    June 18, 2008
Publish

---

[76] This does not amount, of course, to a finding that if the DNA testing turns out as the appellant hopes, it would conclusively establish her innocence. Thus, the appellant would not likely have been able to obtain any DNA testing at all under *Kutzner v. State*, 75 S.W.3d 427 (Tex. Crim. App. 2002). But as we recognized in *Smith v. State*, *supra*, that is not the standard after the 2003 amendment to Article 64.03(a)(2)(A). This means, paradoxically, that even if the DNA testing to which the appellant is entitled under the statute does in fact provide evidence to corroborate her story of an unknown intruder, she may not be entitled to relief by way of habeas corpus because she may well fall short of meeting the onerous standard for proving actual innocence. *See Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996) (in order to obtain relief on an actual innocence claim in post-conviction habeas corpus context, applicant must show by clear and convincing evidence that no reasonable juror would have convicted him in light of new evidence of innocence). But that does not render the DNA testing useless to her. She may still present such evidence to the executive branch of state government in the form of a clemency petition.