Opinion filed May 30, 2013



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00179-CR

_____

## TONY DEAN McCOY, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 39th District Court**

**Stonewall County, Texas**

**Trial Court Cause No. 1772**

## MEMORANDUM OPINION

Tony Dean McCoy appeals the trial court's denial of his motion for postconviction DNA testing pursuant to TEX. CODE CRIM. PROC. ANN. art. 64.03 (West Supp. 2012). The trial court found that the statutory requirements of Article 64.03 were met except for one: Appellant had not established by a

preponderance of the evidence that he would not have been convicted if exculpatory results were obtained through the DNA testing. The trial court found that the pubic hairs that Appellant wanted tested still existed and were in a condition for DNA testing, that they have been subjected to a sufficient chain of custody, that identity was an issue, and that the request for testing was not made to unreasonably delay the execution of the sentence.

In a single issue, Appellant contends that the trial court abused its discretion in denying his request because there is a reasonable likelihood that results from a newer DNA testing technique would be more accurate than the tests available at the time of his trial and that he would not have been convicted if exculpatory results had been obtained through the DNA testing. We reverse and remand.

*Background Facts*

In 1999, a Stonewall County jury convicted McCoy of aggravated sexual assault and assessed his punishment at imprisonment for twenty years. This court affirmed his conviction on October 12, 2000. *McCoy v. State*, No. 11-99-00049-CR, 2000 WL 34234870 (Tex. App.—Eastland Oct. 12, 2000, pet. ref'd) (not designated for publication).

Appellant is the father of the female victim, M.M. M.M. has Down's syndrome and trisomy 21; she is not able to speak. M.M. and her older sister, C.M., lived with appellant, his girlfriend (Paula Tate), and their son, T.M. On July 22, 1998, Appellant allowed C.M., her friend, and T.M. to go to the swimming pool. M.M. stayed at the house with Appellant. Less than an hour later, C.M. and her friend returned to the house for C.M. to get another bathing suit. The house was locked, which was unusual. After C.M. beat on the door, Appellant let them in and walked to his bedroom. While C.M. was looking for her bathing suit, her friend found M.M. naked in the girls' bathroom with duct tape

around her wrists and ankles.  C.M. found blood on M.M.'s stomach and blood on an item of bed covering in the girls' room.  *Id.* at \*1.

C.M. and her friend told Tate about the event the next day.  *Id.* at \*4.  Before Tate took M.M. to the local hospital for an examination, she questioned Appellant about the locked door.  He said he was taking a shower and did not want M.M. or his dog to get out.  After Tate confronted him with the events of July 22, Appellant told her that he had just as well shoot himself.  *Id.* at \*2.  Tate took M.M. to the local hospital on the evening of July 23, where a nurse practitioner examined M.M.  The nurse practitioner opined that there had been a sexual assault or penetration of M.M.  As Tate and M.M. left the hospital, Tate noticed that Appellant's company pickup was in the parking lot and that her car was gone.  Appellant had gone to their house, taken his clothes and guns, and left the state.  Appellant was later arrested in Louisiana.  *Id.* at \*2.

In searching the house, the officers took four pubic hairs from M.M.'s bed covering.  They also obtained pubic hair samples from Appellant and M.M. as well as pubic hair combings from M.M.  According to an analysis performed by the Texas Department of Public Safety laboratory, M.M.'s pubic hairs did not match the ones found on the bed covering.  There was one dark brown pubic hair found in M.M.'s pubic hair combings.  The pubic hairs found on the bed covering were visually similar to Appellant's pubic hair sample.  Three of the pubic hairs tested did not respond to the test.  One of the hairs did respond and matched neither M.M. nor Appellant.  *Id.* at \*3.

Appellant's postconviction motion sought forensic DNA testing of the four pubic hairs and bloodstain from M.M.'s bed covering.  He also sought to test blood, saliva, and pubic hair samples from five named individuals that he claimed also had access to the victim.  Appellant testified on his own behalf at trial.  He

3

related that friends came by for visits after C.M., her friend, and T.M. left to go swimming, and he denied sexually assaulting M.M.

At the hearing on his motion for postconviction DNA testing, Appellant testified that short tandem repeat DNA testing (STR) had been developed as a forensic DNA testing technique subsequent to his trial. Appellant said that the people named in his motion as possible suspects were "in and out of that house at the time of that incident" and were not just chosen at random. He theorized that the pubic hairs that could not be tested in 1999 might be tied to one of those individuals. Appellant argued that, if the DNA test showed that one of those people had lost a pubic hair in the victim's bed, where they had no reason to be, and if that evidence had been presented to the jury, he would not have been convicted.

Appellant pointed out to the trial court that the identity of the perpetrator had been at issue in his trial; that there had been no forensic evidence, DNA or otherwise, linking him to the crime; that the victim could not testify against her attacker; and that the State's case had been entirely circumstantial. The State's expert testified that the pubic hairs were "visually similar" to Appellant's, and the State emphasized that testimony in closing argument. That testimony and the State's argument were key in persuading the jury of Appellant's guilt.

*Standard of Review*

In reviewing the trial court's Chapter 64 rulings, an appellate court usually gives almost total deference to the trial court's findings of historical fact and application-of-law-to-fact issues that turn on witness credibility and demeanor. *Gutierrez v. State*, 337 S.W.3d 883, 890 (Tex. Crim. App. 2011); *Routier v. State*, 273 S.W.3d 241, 246 (Tex. Crim. App. 2008). But the reviewing court reviews de novo all other issues applying law to fact. *Id.* The de novo review usually includes the issue of whether the convicted person has established by a

4

preponderance of the evidence that he or she would not have been convicted if exculpatory results had been obtained through DNA testing. CRIM. PROC. art. 64.03(a)(2); *see Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002).

*Analysis*

The DNA testing at trial showed that one pubic hair belonged to someone other than Appellant or M.M. Because there was evidence at trial that one hair did not belong to Appellant, the trial court concluded that, even if the other hairs also did not belong to Appellant, the jury probably would have convicted Appellant. We disagree with that inference. It ignores weight that the jury no doubt gave to the expert's testimony that the other three pubic hairs were "visually similar" to Appellant's. The State alluded to the existence of the pubic hairs in opening argument. 2000 WL 34234870 at *8. In closing argument, the State argued that the three pubic hairs that could not be tested for DNA evidence were, nevertheless, "visually similar" to Appellant's pubic hair.

The State emphasizes the statement in our opinion, "The testimony reveals that appellant was the only one with access to M.M. at the time of the alleged offense." 2000 WL 34234870 at *5. C.M. and her friend provided that testimony. Appellant, C.M., C.M.'s friend, and Tate all testified that C.M. disliked Tate and wanted to move to Breckenridge to be with her mother and a boyfriend. Appellant testified that he would not allow C.M. to move because C.M. had two boyfriends there "and they are thugs." *Id.* at *7. There was testimony that C.M. had allegedly said that she had a plan to get back to Breckenridge. *Id.* at *1. It was also C.M. and her friend who testified that they found M.M. taped with duct tape in the girls' bathroom; C.M. said she removed the duct tape and threw it into the kitchen trash. The officers searched each trash can in the house, as well as the dumpster outside, but did not find the discarded duct tape. *Id.* at *3.

The evidence against Appellant was entirely circumstantial. Both nurses who examined M.M. testified that M.M. had been the victim of sexual assault or penetration. The nurse practitioner at the local hospital testified that she found a tear about one centimeter in size and two small hematomas in the vaginal area, but she found no bleeding. The sexual assault examiner testified that her examination suggested that there had been chronic penetration that had worn down the wall of the hymen and that the penetrations "had occurred sometime in the past, but [the injuries] were healed now." 2000 WL 34234870, at *3. Because the expert examiner did not see M.M. within twenty-four hours after the alleged event, she did not see acute changes to the hymen, only chronic changes. However, she pointed out that the absence of physical findings did not mean that an assault did not occur because "a lot can heal up in twenty-four hours." *Id.* at *3. According to both the nurse practitioner and the sexual assault examiner, there was no doubt that M.M. had been penetrated on more than one occasion, but they were unable to point to physical evidence that a penetration had occurred on July 22.

Appellant argues that new DNA testing techniques such as STR might identify the donor of the one pubic hair that was not linked to Appellant or the victim and might also determine the source of the other three pubic hairs that were unresponsive to the testing techniques at the time of trial. But the more important point in Appellant's argument is that, if the new testing excludes Appellant as a donor of the three pubic hairs, the prejudice introduced into the case by the expert's testimony and the State's final argument linking Appellant to the assault on the basis of "visual similarity" of the pubic hairs to him would be eliminated.

In *Esparza v. State*, 282 S.W.3d 913, 922 (Tex. Crim. App. 2009), the court found that the defendant had established that he would not have been convicted if DNA testing yielded exculpatory results despite eye-witness identification of him as the one who committed the aggravated sexual assault; the eye-witness

6

identification of the defendant was of "no consequence" in determining that issue. In *Blacklock v. State*, 235 S.W.3d 231, 232 (Tex. Crim. App. 2007), the Court of Criminal Appeals reversed the decision of the court of appeals (which denied the requested DNA testing) despite the fact that the victim knew the defendant and identified him at trial as the one who robbed and sexually assaulted her. The *Blacklock* court held that, under the facts, the defendant had reasonably shown by a preponderance of the evidence "that the victim's lone attacker was the donor of the material for which [the defendant] seeks DNA testing." 235 S.W.3d at 232. In *Smith v. State*, 165 S.W.3d 361 (Tex. Crim. App. 2005), Smith filed a Chapter 64 motion for DNA testing fourteen years after his conviction of aggravated rape. At trial, the State used the presence of seminal fluid to establish the rape. The *Smith* court recognized that, if Smith's DNA did not match the seminal fluid obtained during the victim's rape exam, which was conducted eight hours after she was attacked, the results would be exculpatory.

Although the three cases can arguably be distinguished from this case, we believe the reasoning in the cases supports our conclusion that Appellant has shown that there is at least a 51% chance that he would not have been convicted if DNA testing had shown that none of the pubic hairs were his. *See Prible v. State*, 245 S.W.3d 466, 467–68 (Tex. Crim. App. 2008) (requiring that there must be greater than a 50% chance that the defendant would not have been convicted if DNA testing provided exculpatory results).

We sustain Appellant's issue to the extent that he is entitled to postconviction DNA testing of the pubic hairs and blood samples in the custody of the State. His request for DNA samples from individuals named in his motion was not addressed at the hearing on his motion, and we do not address that request here.

*This Court's Ruling*

We reverse the trial court's decision and remand for further proceedings in accordance with this opinion.

TERRY McCALL

JUSTICE

May 30, 2013

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.