Joe Edward LARUE, Appellant

v.

The STATE of Texas

NO. PD-1544-15

Court of Criminal Appeals of Texas.

Delivered: May 17, 2017

Walter M. Reaves Jr., Attorney at Law, Waco, TX, for appellant.

Wayln G. Thompson, Assistant District Attorney, Beaumont, TX, Stacey Soule, Austin, TX, for the State.

## OPINION

Newell, J., delivered the opinion of the unanimous Court.

Appellant, Joe Edward LaRue, was convicted in a bench trial of the capital murder of Donna Pentecost and sentenced to life imprisonment. His conviction was based in part on DNA evidence and in part on the very detailed testimony of a jailhouse informant. The conviction was affirmed on direct appeal. Appellant filed a motion for forensic DNA testing, seeking re-testing of several things—including the oral swabs from Pentecost, and blood samples from a t-shirt worn by one-time suspect Jackie Ray Augustine. The motion was denied by the trial court. The Beaumont Court of Appeals, holding Appellant could not show that he would not have been convicted if exculpatory results had been obtained through DNA testing, affirmed. *LaRue v. State*, 09-14-00441-CR, 2015 WL 6522816, at *6 (Tex. App.—Beaumont Oct. 28, 2015) (*LaRue III*).

Although Appellant raises a potpourri of complaints about the trial court's ruling and the court of appeals' affirmation of that ruling, we granted review to take a closer look at the trial court's decision to deny testing of the blood on Augustine's t-shirt. After examining the record, we affirm the court of appeals: exculpatory test results here would "merely muddy the waters."

### Facts and Prior Proceedings

Appellant, Darrell Fuselier, Gary Byrd, and Pentecost all worked at Jordan Industries. Jordan Industries provided contract labor to refineries. Many of its workers, including Appellant, Fuselier, and Byrd, lived in barracks on-site at Jordan Industries; Pentecost lived in a house off-site about five blocks from Jordan Industries. Pentecost was known to sell drugs, including heroin and cocaine, to workers at Jordan Industries. Byrd was a narcotics informant.

On the morning of October 15, 1989, police received a call from Byrd about a

possible suicide. An officer picked up Byrd at Jordan Industries, and Byrd directed the officer to Pentecost's house. Pentecost's naked body lay in the backyard, on the side of the house opposite from the driveway. The body was face down; the head was covered. A blood soaked shirt was tied into a knot around her neck. Pentecost's skull had been crushed.

One officer noticed two concrete blocks on the edge of the patio and three impressions where concrete blocks had been. Two impressions were dry; one was moist. Two blocks were being used to jack up a car that was in the driveway. Officers later found the third cement block, stained with human blood, in the lot across the street; the block had grass under it, as if it had not been there very long. Officers collected various items at the scene, including cigarette butts, hair samples, and clothing. They also lifted fingerprints from the door of the house. A rape kit was collected during the autopsy. In 1989, DNA testing was unsuccessful in efforts to determine the assailant.

Appellant was one of six initial suspects from whom the police would eventually obtain blood samples. Fuselier, Byrd, David Ronald Lundy (Pentecost's housemate), Douglas Gurthrie (who was known to have a crush on Pentecost) and James Droddy (who was known to come by the Pentecost house) were the other initial suspects. Augustine was at some point treated as a suspect, but was never asked to give a blood sample.

Greg Slim, Pentecost's common-law husband who had been off-shore working, later identified Pentecost's body. Besides Lundy, Lundy's ex-girlfriend, Dorethea "Dee" Morman, was staying with Pentecost. Lundy and Morman both allegedly slept through the attack; Lundy was still in bed when police arrived; Morman had gone to work that morning without noticing Pentecost's body.

On October 10, 1990, police received a phone call from an anonymous source who claimed to work at Jordan Industries. A woman named "Jewel" had told the informant that Pentecost's murderer was "a large black male" who was a drug dealer in Port Arthur. The informant also said that Fuselier had told him that he and a large black male were with Pentecost shortly before the murder. The three had gone to Port Arthur together to make a drug deal, but the deal "went bad." As they were driving around afterwards, the black male threatened the lives of Fuselier and Pentecost. Fuselier got out of the car and the black male said he would take Pentecost home. Pentecost was murdered 30-40 minutes later. The black male later contacted Fuselier and threatened to kill him if he told anyone. The informant said Fuselier had not cooperated with the police because he feared for his life. A second anonymous 911 caller identified the assailants as Fuselier and a black male from Port Arthur. A police detective identified this caller as Byrd.

1991 DNA typing of the blood of the suspects eliminated all but Appellant from the potential pool of contributors to the oral swabs taken from the body of Pentecost. Clois Eugene Marsh, then a Lieutenant Detective with the Port Neches Police Department, testified that after receiving the reports, "We began to concentrate more heavily on Joe Larue." Although Augustine had dealt heroin to Pentecost, he had gotten high with her, and his shirt had tested positive for blood, Marsh testified that by the time of the typing, Augustine was no longer a suspect.

Well, we submitted the samples for testing, again, in January of 1990. By that particular time, I think Ranger Taylor and I had pretty well satisfied ourselves

that Jackie Ray Augustine had not participated in that murder. And, again, it's just a number of small things that had brought us to that conclusion.... Well, the vehicle that Mr. Augustine had access to was not the vehicle that was initially described to us as having been driven by a black heroin dealer.... Ranger Taylor and I had an opportunity to physically inspect that car really on three different occasions ... and noted nothing.

In 2001, the State again submitted items for DNA testing, including oral swabs, oral slides, fingernail samples, hair and blood cards from Pentecost, a blood vial and bloodstain from Appellant, the shirt from Pentecost's body, and a cigarette butt. The testing revealed that Appellant was the source of the semen on an oral swab from Pentecost, and that Appellant could not be excluded as a contributor of two stains on Pentecost's fingernail samples. The testing results from the other evidence collected did not implicate any other suspects.

Appellant's capital murder trial, before a death-qualified jury, started in 2003, but proceedings were stayed after the trial court granted Appellant's motion to suppress the results of DNA testing as a sanction for the State's failure to give timely discovery.[1] The State appealed the ruling. The Ninth Court of Appeals reversed the order of the trial court on May 15, 2003, finding that the State's failure to produce the evidence was not willful. *State v. LaRue*, 108 S.W.3d 431, 437 (Tex. App.—Beaumont 2003) (*LaRue I*). This Court granted review of that decision and affirmed it, in late 2004. *State v. LaRue*, 152 S.W.3d 95 (Tex. Crim. App. 2004).

The case went back to the jury in 2005. Three days in, Appellant waived his right to a jury in exchange for the State's waiver of the death penalty. He also entered into certain stipulations concerning several of the exhibits that contained the DNA evidence. The trial court took judicial notice of all the evidence prior to releasing the jury and then continued the trial.

At trial, Raymond Gross testified that while incarcerated in the county jail, Appellant told him specific details about how he murdered Pentecost. Appellant told Gross that he went to Pentecost's house between 1 and 2 a.m. He said they got into an argument outside. Appellant then told her to take her clothes off, choked her with a shirt, and forced her to have oral sex. Pentecost said she would send him to prison for the rest of his life. Appellant responded by smashing Pentecost's head in with a cement block. He then washed the block off with the remaining liquor he had in a bottle that he was drinking and hauled the block across the street to a brush pile. Appellant bragged about the killing and said the only evidence against him was his semen.

Another inmate, Jermaine Norman, testified that he overheard Appellant tell yet another inmate that he hit Pentecost in the head with a brick after having sex with her. The cement block—as mentioned above—was found across the street in a brush pile and it had been washed off with some unknown substance. According to testimony at trial, the location of the cement block had never been released to the public and only the killer would know that information.

Byrd testified that drugs were common at Jordan Industries, and that Pentecost brought drug dealers to Jordan Industries to sell drugs. Byrd said he saw Appellant

---

1. Appellant was originally indicted for the offense of capital murder in 1991. That indictment was dismissed in 1994, and the case remained dormant until Appellant was indicted again in 2001.

the day before Pentecost's body was found. Appellant told him that he and Fuselier were going to Port Arthur. Byrd did not see Appellant again until 2 or 3 a.m., when he saw Appellant sitting in a car and talking to another man outside at Jordan Industries. Later, Byrd heard Appellant come in, shower, and go to bed.

The next morning Byrd went with Appellant to Pentecost's house to tell her about some potential work. They found Pentecost's body. Byrd said that after the murder, rumors circulated at Jordan Industries. Byrd said that Fuselier told him that there was a heroin dealer who "messed around" with Pentecost and had a fight with her and said something about getting a brick; Fuselier claimed that Pentecost was killed by someone named "Reggie." Byrd also testified that Appellant told him that Pentecost was dead because she owed a heroin dealer a thousand dollars.

Among Appellant's witnesses were Jordan Industries employees Gorgette and Luther Loupe. They testified that Appellant was at Jordan Industries at midnight on the night of the crime. According to their testimony, Appellant was in his bunk when Luther did a bunk check at midnight, 2 a.m., and 4 a.m.

Neighbors who shared a backyard fence with Pentecost testified that they heard "party noise" coming from Pentecost's yard that was different in "tone" around 1 a.m. on the night of Pentecost's murder. One of these neighbors looked through the fence between 1 and 1:45 a.m. and saw at least two men walking around and someone sitting. One of the men was wearing a baseball cap with a ponytail. The next day she noticed officers in the neighborhood but they never questioned her. She testified that she did not come forward with her information until 1993, after a private investigator contacted her. She gave a statement to Lieutenant Detective Marsh in 1993, but the statement did not include a reference to a man with a ponytail.

Appellant himself testified that he did not kill Pentecost, that they were friends, and that they had a sexual relationship. He said Pentecost provided heroin and cocaine to Appellant and others, and that she had gotten drugs from Augustine. He said he went to Pentecost's house between 12 and 1 a.m., on the morning her body was found. He said they had consensual oral sex on the back porch. After he left, Appellant called Augustine. Augustine had asked Appellant to let him know if Pentecost was home and alone because she owed him money. Augustine told Appellant he was going over to Pentecost's house. Appellant also testified that after the murder, Fuselier confessed to having done it. Appellant said Fuselier wore a baseball cap with his long ponytail through the back of the hat.

Yet, Appellant was impeached with his many previous statements. He acknowledged that the officers had "probably got 15 or 20 different statements from me back in them days." Appellant first implied that Pentecost's killer might have been one of her and her husband Greg's roommates. According to this statement, Pentecost had expressed fear of this roommate. The roommate had threatened her with a knife. Greg had told the man to get out that day because of his heavy drug use around Greg and Pentecost's two children. Appellant next stated that the killer was a woman, and that someone had returned to Jordan Industries at 3:30 in the morning the night of the murder, covered in blood. He would not name either person or say if they were one and the same.

Appellant did not mention having sex with Pentecost the night she was killed in any of these statements. "I figured it was none of their business, to be honest, because its happened several times." He also did not say anything about Augustine in

these statements. When confronted with this omission, Appellant responded "You got me there." However, Appellant went on to say that it did come to his mind that Augustine had killed Pentecost because he had called "that mean rotten bastard" Augustine that night and rumors were flying that a drug dealer on the west end had killed Pentecost. Still, Appellant said "I don't know who the last one was to go over there." And he could not say if Augustine had gone over there. Appellant later acknowledged that he did not initially tell officers he had been at Pentecost's house because "Donna was found murdered, and I was scared." According to Appellant, it would have been easy to think he had done it based upon his background.[2] He finally discussed having sex with Pentecost after police confronted him with DNA test results. The trial court admitted Appellant's unsigned statement, titled "In Custody Statement" and dated February 23, 1993. Appellant conceded that this was an "appreciably different" statement than previous statements he had given.

In this statement, Appellant said he had sexual contact with Pentecost at least a dozen times. He said that Kerry Bellard, who he knew from Jordan Industries, and Augustine, whom he did not know, approached him and wanted him to beat up Pentecost because she had stolen drugs from Augustine. Appellant turned down the job because he was friends with Pentecost and her family.

According to this version of events, Appellant went drinking at the Boudain Hut in Port Arthur on the 14th or 15th of October 1989 and returned to Jordan Industries about 2:30 to 3:00 a.m. Bellard and Augustine were in a car at Jordan Industries when Appellant returned. Bel-

lard asked Appellant to call Pentecost's house and make sure she was home alone. Appellant did so and received $500 for making the call. He then told Bellard and Augustine he was going to her house to make sure she was alone.

Appellant stated that he went to Pentecost's house and had consensual oral sex with her even as he knew that Bellard and Augustine were waiting on the street corner to beat her up. He said she was not naked and he was not at the house for more than 15 to 20 minutes. Appellant told Pentecost he would see her in the morning and left. He then went to the street corner and informed Bellard and Augustine that Pentecost was there alone. Appellant walked back to Jordan Industries where he went to sleep.

In this version of events, Appellant claimed he learned from Bellard, about two days after Pentecost's death, that, after Appellant left Pentecost's house, Bellard and Augustine had gone there, picked her up, and took her riding around. Augustine confronted Pentecost about the stolen drugs. Bellard began choking Pentecost, and Augustine began hitting her. They took her back home, threw her in the backyard, and began kicking her. Pentecost started screaming and fighting, and Bellard grabbed a brick in the yard and struck her. Bellard then threw the brick in a field across the street, and he and Augustine drove off.

This last statement, though closest to his trial testimony, differed in one fundamental way. Appellant testified that it was Fuselier who was with Augustine. Yet, in this statement Appellant said it was Bellard.

2. Appellant had felony convictions for aggravated assault in Texas and aggravated assault and kidnaping in New Mexico.

Thus, at trial there was evidence that suggested the following possible killers: 1) a large black male drug dealer from Port Arthur, 2) Fuselier and a black male from Port Arthur, 3) Appellant, 4) "Reggie," 5) Appellant and Fuselier, 6) two men—one with a ponytail (presumably Fuselier), 7) a male roommate (presumably Lundy), 8) Augustine and Fuselier, 9) a woman, or 10) Augustine and Bellard. Of all these individuals, only Appellant put himself at the scene of the murder.

Defense counsel argued that the evidence was insufficient and the real killer "is still out there on the streets." The State pointed to the DNA evidence, the testimony of the jailhouse informant, and Appellant's failure to stick to "one story at one time and stick to it all across the board." The trial court found LaRue guilty and sentenced him to life imprisonment. The court of appeals, rejecting among other things a complaint about the sufficiency of the evidence, affirmed. *LaRue v. State*, No. 09-05-145-CR, 2007 WL 1501646 (Tex. App.—Beaumont May 23, 2007, pet. ref'd) (not designated for publication) (*LaRue II*).

### Chapter 64 Proceedings

In June of 2014, Appellant filed his post conviction motion for forensic DNA testing—the subject of this petition.[3] Appellant sought further testing of the oral swabs and fingernail scrapings from Pentecost, Augustine's T-shirt, a bloody fingerprint found on a door, and a cigarette butt. The parties agreed that all of the items men-

tioned in the post-conviction motion were previously tested.

Article 64.01 of the Code of Criminal Procedure provides, in part, as follows:

(a-1) A convicted person may submit to the convicting court a motion for forensic DNA testing of evidence that has a reasonable likelihood of containing biological material. The motion must be accompanied by an affidavit, sworn to by the convicted person, containing statements of fact in support of the motion.

(b) The motion may request forensic DNA testing only of evidence described by Subsection (a-1) that was secured in relation to the offense that is the basis of the challenged conviction and was in the possession of the state during the trial of the offense, but:

(1) was not previously subjected to DNA testing; or

(2) although previously subjected to DNA testing, can be subjected to testing with newer testing techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test.

TEX. CODE CRIM. PROC. art. 64.01(a–1); TEX. CODE CRIM. PROC. art. 64.01(b)(1)&(2).

 But there is a threshold issue. Article 64.03 provides that a convicting court may order forensic DNA testing only if the court finds that "the person would not have been convicted if exculpatory re-

---

**3.** At the hearing on the DNA motion, the State asked the trial court to take judicial notice of all of the previous records in this case. We have recognized that the scope of evidence that an appellate court may review on appeal from the denial of a post-conviction motion for DNA testing is not limited to evidence relating to the motion and/or hearing on the motion for DNA testing. *Asberry v. State,* 507

S.W.3d 227, 229 (Tex. Crim. App. 2016) (Chapter 64, which permits comparison of the proof offered at trial with the proof currently available necessitates are view of the prior proceedings; "all of the evidence that was before the trial court before it made its ruling should be available to, and considered by, the reviewing court").

sults had been obtained through DNA testing." TEX. CRIM. PROC. CODE art. 64.03. We have limited "exculpatory results" to only those results excluding the convicted person as the donor of this material. *State v. Swearingen*, 424 S.W.3d 32, 38 (Tex. Crim. App. 2014); *Blacklock v. State*, 235 S.W.3d 231, 232 (Tex. Crim. App. 2007). This requires the convicted person to show that he, more likely than not, would not have been convicted if results of the requested testing exclude him. *Swearingen*, 424 S.W.3d at 39. The required showing has not been made if exculpatory test results would "merely muddy the waters." *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002). Although there may be subsidiary fact issues that are reviewed deferentially, the ultimate question of whether a reasonable probability exists that exculpatory DNA tests would change the result on guilt-innocence is an application-of-law-to-fact question that does not turn on credibility and demeanor and is therefore reviewed de novo. *Id.*

### Appellant's Motion

Appellant asserted in his motion that the testing previously done in this case was at best confusing. He stated that the various samples were sent to several labs for testing and that each round of testing produced different results, and raised its own set of questions. Appellant noted that "the oral swabs have been tested at different times—and by different labs—with varying results." Appellant contended in the motion that he established at trial, by virtue of an 1994 affidavit from crime lab director Ron Singer, that there were "problems and inconsistencies with both the reports ... which raised the possibility that defendant might not be the donor [of the DNA found in the oral swabs and stains]." Appellant also challenged the "integrity of his blood sample" that was used for the DNA comparison on the swabs and stains, because one crime lab determined his blood was Type A and another crime lab determined his blood was Type O. According to Appellant, re-testing is necessary because "more current techniques and procedures should now be able to produce far more accurate results than was available in the mid-90's."

The State, in its response, did not dispute that the identity of the killer was an issue. Nor did the State dispute that evidence capable of testing still exists or that such evidence satisfies the chain of custody requirements. Rather, the State simply argued that Appellant failed to establish by a preponderance of the evidence that he would not have been convicted if further DNA testing were to produce exculpatory results.

The trial court denied the motion without making findings. Appellant then filed a combined reply to the State's Response and Motion to Reconsider, fleshing out his arguments for testing. With respect to the shirt taken from Augustine, Appellant argued that Augustine was

> [o]ne of the suspects initially identified by police ... a known drug dealer, who had provided drugs to the victim.... Police Chief Marsh talked with Augustine on [October] 18, and noticed blood on his shirt.... The shirt was taken as evidence, and submitted to the local lab, and later to the Texas Department of Public Safety. Initial testing indicated blood was on the shirt, but no results were ever obtained ... While blood samples were taken from several suspects, no samples were taken from Augustine, and therefore no comparison could be made with him.

Appellant asserted that, if Pentecost's blood were found on the shirt, it would place Augustine at the scene.

Acknowledging, and apparently not challenging the fact that his profile was found on the fingernail scrapings, Appellant said that "the results established a mixture. If another contributor could be identified, that would place someone else at the scene." He repeated his argument about the oral swabs, again suggesting that he might not be the donor. Appellant appealed the ruling on the motion, and the Beaumont Court of Appeals affirmed. *LaRue III*.

## Appellant's Petition for Discretionary Review

Appellant's petition only takes issue with the court of appeals' analysis of his claims as to re-testing of the oral swabs and Augustine's t-shirt.

### *The oral swabs and Appellant's blood sample*

■ Regarding the oral swabs and Appellant's blood sample the court of appeals stated,

> LaRue admitted at trial and later in his brief on appeal that he had consensual sex with the victim on the evening of her death. Therefore, even if he is correct in his argument that there is a possibility that further testing would exclude LaRue from matching the swabs and semen taken from Pentecost, he has failed to explain how such results would affect his conviction in light of other inculpatory evidence; additionally, even assuming new tests of LaRue's blood would be more accurate, LaRue has not established that new results would be more

probative than the evidence the trial court considered.[4]

Appellant faults the court of appeals for failing to assume exculpatory results. According to Appellant, the court should have assumed the results would not simply identify another contributor; they would have excluded Appellant as a possible contributor. "In other words, the State would be left with evidence that suggested someone else had oral sex with the victim before her death."[5]

■ The court of appeals reasonably concluded that Appellant's argument regarding the oral swabs failed. The mistyping, in 1990, of Appellant's blood as A (when it is really O) has no bearing on Appellant's guilt or on the findings regarding the oral swabs. It was, in fact, brought to the attention of the fact finder. The DPS's Irma Rios testified "I'm not sure why it's marked [by Jefferson County] as Type A. All I know is that I did type it as Type O." And somebody's blood type doesn't change from Type A to Type O." Appellant does not here dispute that he is Type O. And Appellant, at trial, stipulated to the integrity of Exhibit 44—his own blood sample. He stipulated and agreed, among other things,

> That Exhibits 18 (Donna Pentecost's shirt and blood, taken from her body at autopsy), 25E (oral swabs from Donna Pentecost taken at autopsy), 25K (fingernail scrapings from Donna Pentecost taken at autopsy), 25L (fingernail scrapings from Donna Pentecost taken at autopsy), 44 (blood sample from Joe Edward Larue) shall be admitted into

---

4. *LaRue III*, 2015 WL 6522816, at *5.

5. Appellant argued in his brief to the court of appeals that it would be wrong to assume that the semen in the oral swabs was his because there was expert testimony presented at trial that there are no scientific estimates as to how long semen could remain in the mouth,

but that semen would remain longer following death. "Therefore, if appellant did have oral sex with the victim earlier in the evening there is a chance that could have already been gone, and what remained would be semen left by whoever killed her." App. Br. at 8.

evidence, *and that the source of these exhibits is as stated in this agreement and stipulation*, and the integrity of the chain of custody of all these exhibits is stipulated and agreed to be complete and unbroken from their date of seizure or collection to the date of analysis and reporting of results.[6]

(emphasis supplied). We further note that although the oral swabs have been tested at different times, and by different labs with varying results, those results were all consistent on the fact that Appellant could not be excluded as a donor. For stains that were tested and did yield a result, the movant must show that new testing techniques will provide a reasonable likelihood of results that are more accurate and probative than the results of the previous tests. *Routier v. State*, 273 S.W.3d 241, 250 (Tex. Crim. App. 2008); TEX. CRIM. PROC. CODE art. 64.01(b)(2).

It may well be that the new testing techniques would yield more accurate and probative results, but on the facts of this case, Appellant has not shown that any favorable or exculpatory test result would change the probability that he would have been convicted. Appellant admitted to having oral sex with Pentecost shortly before her death, and his DNA—as he does not currently dispute—was found in the autopsy fingernail scrapings. Appellant has not established, by a preponderance of the evidence that he "would not have been convicted if exculpatory results [the oral samples showing no DNA from Appellant, but DNA from one of the other suspects] had been obtained through DNA testing." He has therefore failed to satisfy the statutory requirement set out in Article 64.03(a)(2)(A).

### Augustine's shirt

In affirming the trial court's decision to deny testing of the blood on Augustine's shirt the court of appeals again relied on Appellant's own admissions:

LaRue himself testified that Augustine told LaRue that Augustine was going to Pentecost's house on the night of the murder. LaRue also gave an "In Custody Statement" to the police, which was admitted into evidence at trial, wherein he stated that Augustine was at Pentecost's house on the night of the murder, that Augustine hit her during an argument, and that another person with Augustine grabbed a brick and struck Pentecost.[7]

The court concluded that "even if the blood found on Augustine's shirt could now be typed or matched to Pentecost, such results would not be more probative than the evidence that was already before the trial

---

6. This stipulation appears in the "Defendant's Waiver of Jury Trial, State's Waiver of Death Penalty and Stipulation." The document is part of the clerk's record and is signed by the ADA, Appellant himself, Appellant's attorney and the trial judge. Among the numerous stipulations were that

* State's Exhibits Numbers 66, 67 & 68, reports made by Cassie Carradine, DPS Crime Lab, Austin, Texas are admitted into evidence for all purposes of consideration by the finder of fact, that the integrity of the chain of custody of all items of evidence received and analyzed in said reports is stipulated and agreed to be complete and unbroken from their date of seizure or collection to the date of analysis and reporting of results by the said Cassie Carradine; and

* Joe Edward Larue waives the right to confrontation and cross-examination of any witness relating to the stipulated issues of DNA analysis, chain of custody pertaining to items subjected to DNA analysis, and cause and mechanism of death contained within this stipulation of evidence.

7. *LaRue III*, 2015 WL 6522816, at *6.

court."[8] As Appellant notes, the court of appeals did not recognize that the presence of Pentecost's blood on Augustine's shirt would corroborate Appellant's statement and his testimony that Augustine and another man went to Pentecost's house after Appellant left. According to Appellant, if corroborated by physical evidence, Appellant's testimony and statement would be recast in a more believable light.

Exculpatory DNA test results could, at most, show that someone other than Appellant—perhaps Augustine—had also left his DNA at the crime scene. This might inculpate Augustine, but it would not exonerate Appellant. *Wilson v. State*, 185 S.W.3d 481, 485 (Tex. Crim. App. 2006) ("if newer, more discriminating DNA testing showed that another perpetrator was involved, that finding would not exonerate appellant because it would show nothing more than there was another party to the crime, at best"). At most, it would only muddy the waters.

We recognize that in this case, identity was, is, and remains an issue. The State concedes this point. The police identified numerous potential suspects from the beginning, and various stories involving various players circulated in the months and years afterwards. There was evidence from multiple sources that Pentecost was a drug dealer, and that she did business with Augustine. Appellant's testimony and one of his statements inculpated Augustine. A neighbor testified that she heard and saw two men in Pentecost's backyard in the early morning hours. And while one inmate testified that Appellant confessed to the crime and another inmate overheard

Appellant confess to someone else, inmate testimony is suspect.[9]

We agree with Appellant that the court of appeals failed to acknowledge and consider that if re-testing of Augustine's shirt revealed the presence of Pentecost's blood it would enhance the credibility of Appellant's testimony and one of Appellant's prior versions of events. But his DNA found under Pentecost's fingernails—which he does not contest—connects Appellant to this crime with "unparalleled accuracy." *See Maryland v. King*, —— U.S. ——, 133 S.Ct. 1958, 1972, 186 L.Ed.2d 1 (2013) ("the only difference between DNA analysis and the accepted use of fingerprint databases is the unparalleled accuracy DNA provides"). Appellant has therefore failed to satisfy the statutory requirement set out in Article 64.03(a)(2)(A). We affirm the Beaumont Court of Appeals.

---

8. *Id.*

9. Article 38.075 of the Texas Code of Criminal Procedure, enacted in 2009, provides that a defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the de-

fendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.