

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

————————————————————

No. 02-19-00008-CR

————————————————————

DUSTIN W. NALL, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court No. 1078788D

Before Pittman, Bassel, and Womack, JJ.
Per Curiam Memorandum Opinion

## MEMORANDUM OPINION

In one point, Appellant Dustin W. Nall argues that the trial court erred in failing to grant his amended motion for postconviction DNA testing pursuant to Chapter 64 of the Texas Code of Criminal Procedure. The State counters that the trial court properly denied the motion because Nall does not meet requirements for new testing of previously-tested evidence and did not establish a reasonable probability that he would not have been convicted if results of DNA testing excluded him as the donor of the tested biological evidence. We agree. Because Nall did not establish his entitlement to DNA testing, we affirm the trial court's order.

## STANDARD OF REVIEW

We review the trial court's ruling on a Chapter 64 issue under a bifurcated standard of review. *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002). We afford the trial court almost total deference in the determination of historical facts and in the application of law to those facts when they turn on credibility and demeanor. *Id.* We review de novo all other application-of-law-to-fact questions. *Id.*

## PROCEDURAL BACKGROUND

Nall was convicted of the August 4, 2007 stabbing death of Bertha Wilkerson. Nall was sentenced to confinement for life without parole. Nall's conviction was upheld on appeal, and a 2014 application for writ of habeas corpus was denied.

In March 2018, Nall requested and was appointed counsel under Chapter 64 of the Texas Code of Criminal Procedure to assist him in filing a motion for

postconviction DNA testing. *See* Tex. Crim. Proc. Code Ann. art. 64.01(c). His appointed attorney filed a motion for DNA testing, followed by an amended motion. In the amended motion, Nall sought testing of various items and blood samples, including the blood samples taken from the knife he had with him when arrested, and asserted that "[s]ince no witness positively identified the person responsible for committing the offense, DNA evidence favorable to [him] would have created a reasonable probability that [he] would not have been convicted."

In November 2018, the State filed a response as well as proposed findings of facts and conclusions of law. The trial court denied Nall's motion and adopted the State's proposed findings and conclusions. Nall brought this appeal.

## CHAPTER 64 REQUIREMENTS

Chapter 64 of the Texas Code of Criminal Procedure authorizes a trial court to order postconviction DNA testing in certain circumstances. Before ordering testing, the trial court must find that it is reasonably likely "that the evidence contains biological material suitable for DNA testing." *See id.* art. 64.03(a)(1)(B). Further, the movant must establish by a preponderance of the evidence that he "would not have been convicted if exculpatory results had been obtained through DNA testing." *See id.* art. 64.03(a)(2)(A). Exculpatory test results mean "results excluding the convicted person as the donor of th[e] material." *LaRue v. State*, 518 S.W.3d 439, 446 (Tex. Crim. App. 2017).

3

The preponderance of the evidence standard means that article 64.03 "requires the convicted person to show that he, more likely than not, would not have been convicted if results of the requested testing exclude him." *Id.* Thus, if exculpatory test results would "merely muddy the waters," the convicted person has not made the required showing. *Id.*

## DISCUSSION

## I. The Trial Court Made Findings About Trial Evidence and Earlier DNA Testing.

The trial court's findings discussed both the evidence at Nall's trial and the results of previous DNA testing in the case. We summarize the relevant findings.

### A. Nall Stabbed Wilkerson After Attacking His Girlfriend and Uncle.

In the summer of 2007, sixty-eight-year-old Wilkerson lived in a townhouse duplex with her daughter Sandra and her seventeen-year-old grandson Spencer. Nall's girlfriend, Camille Cuellar, had been Wilkerson's neighbor.

Wilkerson kept prescription medication for her diabetes and lupus on her dining room table. Nall had been in Wilkerson's house sometime before the murder; he had approached her in her driveway and asked for a ride to see his uncle, and she let him into her kitchen three times for a drink of water. Wilkerson's prescription medications were clearly visible to anyone who walked into the kitchen, and she mentioned to Nall that she took pain medications.

4

Before the murder, Nall was living in a motel room with his mother, stepfather, uncle, and Cuellar. In the early morning hours of August 4, 2007, Nall's mother awoke to find Nall's uncle lying on the floor in a pool of blood. Cuellar was sitting on the bed with her throat cut. Nall was standing by the door with a knife in his hand. After about forty minutes, his mother called 9-1-1. She initially would not give a description of the perpetrator, but after about two hours, she identified her son.

Around this same time, Wilkerson's neighbors and grandson Spencer were awakened by her screams. Spencer went downstairs and saw Nall standing in the doorway and his grandmother lying on the ground. Spencer yelled at Nall and then went upstairs to get his shotgun. Nall followed Spencer upstairs and went into a bathroom. He then left the bathroom and walked toward Spencer with a knife in his hand. When Spencer turned off the gun's safety, Nall fled downstairs, through the dining room, and out of the house.

The police found Nall in a nearby park and began chasing him on foot. Nall exhibited a knife before the police deployed a taser to bring him to the ground. From the area where Nall was arrested, the police collected six prescription pill bottles[1] and a set of car keys. One of the bottles belonged to Nall's uncle and another to Wilkerson. The car keys were Wilkerson's.

---

[1]The trial court's findings do not specify where the evidence was collected, but reports in the record state that Wilkerson's prescription bottle was found under a foot bridge in the park.

5

**B.** **The Tarrant County Medical Examiner's Office Tested Biological Material and the Results Inculpated Nall.**

The Tarrant County Medical Examiner's Office (TCME) tested various biological material on samples collected by police in its investigation. In reports from October 2007, December 2007, and February 2008, TCME made findings regarding DNA profile mixtures found on Nall's clothing; on the knife Nall had when apprehended; and on the front inside band, back inside band, and the bill of a baseball cap found at the bottom of the stairs in Wilkerson's home. In August 2018, TCME issued amended reports applying the Texas Forensic Science Commission's new DNA mixture interpretation protocol and corrections to the FBI's STR Population Database.[2]

- *Knife blade*:  In its October 2007 report, TCME found that a DNA profile from the knife blade's edge was a mixture from which Wilkerson could not be excluded as a contributor and that "no further conclusion is made regarding the additional contributors to this mixture."  In its August 2018 amended report, TCME found that the mixture on the blade edge was one from which "no conclusion can be made due to the number of its contributors, its complexity[,] and its quality."

- The October 2007 report further found that elsewhere on the knife blade was a mixture of DNA from which Nall and his uncle were not excluded.  While the trial court's findings do not reflect any amendment to this part of the report, the State included a copy of the August 2018 amended report with its response

_____

[2]TCME also issued an August 10, 2009 report finding that the major male profile obtained from Wilkerson's prescription bottle matches Nall's profile and that the DNA profiles from Wilkerson's kitchen and door swabs matched Wilkerson's profile at thirteen genetic loci.  An August 2018 amendment to the report makes the same findings.  Nall does not discuss these samples in his brief or argue that retesting would exculpate him.

to Nall's motion. The amended report stated that "[d]ue to the complexity of the mixture and the known biological relatedness of [Nall and his uncle], no conclusion or statistical assessment can be made regarding the sources to this mixture."

- *Knife blade and handle juncture*: In its October 2007 report, TCME found a DNA profile on the juncture of the blade and handle that was a mixture whose major profile matched Wilkerson[3] and that no conclusion could be drawn regarding Nall or Nall's uncle. In its August 2018 amended report, TCME made the same finding.

- *Nall's shirt and shoe*: TCME's December 2007 report found that Cuellar could not be excluded as a contributor to the mixture on Nall's shirt and shoes. Its August 2018 amended report found the same.

- *Nall's jeans and jacket*: TCME's October 2007 report found that a DNA profile from the clothing matched Nall's uncle at thirteen genetic loci. TCME's August 2018 amended report found the same.

- *Baseball cap front inside band and bill*: In the February 2008 report, TCME reported that Wilkerson and Nall's uncle were excluded as contributors to the mixture on the cap's front inside band and to the mixture on the bill, but Nall could not be excluded. In the 2018 amended report, Wilkerson and Nall's uncle were still excluded, but "[n]o further conclusions can be drawn regarding the DNA's source due [to] the complexity of its mixture and its quantity/quality." In other words, it no longer included the finding that Nall could not be excluded.

- *Baseball cap back inside band*: In the February 2008 TCME report, Nall and Cuellar could not be excluded as contributors to a mixture found on the cap's back inside band, but Wilkerson and Nall's uncle were excluded. The 2018 report reached the same findings.

---

[3]For each reported finding in which TCME matched a DNA profile, it provided the random probability of selecting an unrelated individual. We have omitted that part of TCME's findings for brevity.

7

## II. Nall Did Not Establish His Entitlement to DNA Testing.

### A. Nall Failed to Show New Techniques Would Provide Better Results.

For evidence previously subjected to DNA testing, a motion under Chapter 64 may request testing of that evidence if it "can be subjected to testing with newer testing techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test" or if it was tested by a laboratory that was engaging in faulty testing practices during the time period that it tested the material at issue. *See* Tex. Code Crim. Proc. Ann. art. 64.01(b)(2). Biological materials recovered by police in their investigation of Wilkerson's murder were subjected to DNA testing in 2007, 2008, and 2009. As stated in the trial court's findings, in August 2018, TCME issued amended reports applying the Texas Forensic Science Commission's new DNA mixture interpretation protocol and corrected information from the FBI's STR Population Database.

In the trial court, Nall provided no evidence or explanation that new testing techniques would provide more accurate or more probative results than the initial testing or that newer interpretation protocols would provide more accurate or more probative results than TCME's August 2018 reinterpretations.[4] *See id.*; *cf. Routier v. State*, 273 S.W.3d 241, 251 (Tex. Crim. App. 2008) (holding that convicted person's

---

[4]We assume for purposes of this opinion that applying new interpretation protocols to the results of previous testing is a "newer testing technique" for purposes of article 64.01(b)(2).

motion satisfied article 64.01(b)(2) by including affidavit from expert who stated that current "clean up" procedures were better than prior techniques and would make it more likely that retesting would yield a result when prior testing did not). His only evidence relevant to that point was a March 2018 letter to him from the district attorney's office notifying him that the Texas Forensic Science Commission was in the process of reviewing certain DNA mixture interpretation protocols used to interpret DNA test results and that his case could potentially be affected. This letter preceded the August 2018 reinterpretations.

Because Nall failed to carry his burden to establish his entitlement to postconviction DNA testing under article 64.01 for the items that were previously tested, the trial court did not err in denying the motion for testing of those items.

## B. Exculpatory Results Would, At Most, Muddy the Waters.

Nall also asserted in his motion that some of the samples collected by the police contained biological materials that were not tested. Nall argues on appeal that DNA testing could "establish evidence certain to show another was involved in the actual commission of the offense" and therefore exonerate him.

### 1. The Presence of Third-Party DNA Can Meet the Convicted Person's Chapter 64 Burden in Some Cases . . .

To be entitled to the requested testing, Nall had to show "by a preponderance of the evidence—a greater than 50% likelihood—that he would not have been convicted if the proposed testing's exculpatory results were available at the time of his

trial." *See Reed v. State*, 541 S.W.3d 759, 774 (Tex. Crim. App. 2017), *cert. denied*, 138 S. Ct. 2675, 201 L. Ed. 2d 1071 (2018); *see also LaRue*, 518 S.W.3d at 446. The question of whether a reasonable probability exists that exculpatory DNA tests would prove a convicted person's innocence is an application-of-law-to-fact question that we review de novo. *Skinner v. State*, 122 S.W.3d 808, 813 (Tex. Crim. App. 2003).

"[U]nder some circumstances, the presence of DNA from a third party is so strongly exonerating that the convicted person's burden will be met despite the existence of other substantial inculpatory evidence." *Hall v. State*, 569 S.W.3d 646, 656 (Tex. Crim. App. 2019). "[W]hen it is clear that the biological material in question was left by a lone assailant," the presence of a third party's DNA meets this burden. *Id.* at 657; *see also Esparza v. State*, 282 S.W.3d 913, 922 (Tex. Crim. App. 2009) (holding that in a sexual assault case with one perpetrator, "any overwhelming eye-witness identification and strong circumstantial evidence . . . supporting guilt is inconsequential when assessing whether a convicted person has sufficiently alleged that exculpatory DNA evidence would prove [the convicted person's] innocence").

### 2.    . . . But Not in this Case.

In his amended motion, Nall identified thirty samples the police collected in the investigation, which he contends could have contained biological material, some of which he asserted had not previously been tested. He did not, however, identify which of the samples had not previously been tested. In his brief, he includes no argument about why exculpatory results from the testing of these previously-untested

10

items would have resulted in a different outcome at trial. He focuses his argument on (1) the knife he had with him when police arrested him and (2) the baseball cap found at the bottom of the stairs at Wilkerson's home. But for both the previously-untested items and the already-tested knife and baseball cap, Nall failed to carry his burden to show that exculpatory results from testing these items would have resulted in a different outcome at trial.

Nall's trial included strongly inculpatory circumstantial evidence, which Nall does not deny. Indeed, he recognizes that it is "compelling." Nall argues, however, that while available evidence incriminates him, retesting the evidence, and in particular the knife and baseball cap, can show that another person was at the crime scene and handled the knife. He points out that the profile obtained from the blade edge of the knife "was a mixture from which no conclusion could be made due to the number of its contributors, its complexity[,] and its quality." And, he argues that "retesting of the baseball cap may show the DNA of another person because [he] and . . . Cuellar could not be excluded as DNA contributors" to the cap's inside band. He contends that he "could still be at the scene of the offense and eventually be in possession of a knife used to commit the offense, yet DNA retesting may provide evidence certain that another person's DNA was on the knife that was used in the commission of the offense."

However, the possibility of the presence of another person at the scene who at some point in time handled the knife does not meet Nall's burden. On the day of the

murder, Nall's mother woke to find Nall's uncle and girlfriend with knife wounds and Nall standing in the doorway with a knife in his hand. Not long after, Wilkerson's grandson saw Nall standing over Wilkerson's injured body soon after he heard her screaming, and he, too, saw a knife in Nall's hand. Nall's bloodstained clothing was taken into custody, and testing revealed DNA from Nall's uncle and girlfriend on his clothes. Testing of the knife Nall had when arrested indicated the presence of Wilkerson's DNA. Nall had Wilkerson's keys and prescription bottle with him, as well as a prescription bottle of his uncle's. The hypothetical presence of some unknown person at the scene does not explain how Nall left his hotel room with blood from both his girlfriend and uncle on his clothing and a knife and his uncle's prescription bottle in his possession, arrived not long after at Wilkerson's around the time of her attack, and then left Wilkerson's home carrying a knife with her blood on it and her prescription bottle and car keys. Nor does it explain away witnesses seeing him standing near the victims with a knife almost immediately after the attacks and, in the case of Wilkerson, standing right over her body. *See State v. Swearingen*, 424 S.W.3d 32, 38–39 (Tex. Crim. App. 2014) ("We are not persuaded that results showing the presence of another DNA donor . . . would overcome the 'mountain of evidence' of the appellee's guilt . . . because the victim's having encountered another person would not factually exclude the appellee from having killed her." (citation omitted)); *see also Hall*, 569 S.W.3d at 657 (contrasting the court's prior "lone assailant" cases, which involved sexual assault and in which the victim testified that there was only one

12

assailant, with the appellant's case, in which "[i]t is simply not possible to conclude from this evidence that there was a lone assailant without also concluding that the lone assailant was Appellant" and in which "if DNA evidence pointed to someone [other than the appellant], that fact would just suggest that this other person was involved with [the a]ppellant in the murder").

Given the evidence, even if testing biological material had produced results excluding Nall as the material's donor, the jury would still have heard other evidence strongly implicating him in Wilkerson's murder. We cannot say that the trial court erred in denying Nall's motion.

We overrule Nall's sole point.

## CONCLUSION

Having overruled Nall's sole point, we affirm the trial court's order.

Per Curiam

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  June 27, 2019

13