

# NUMBER 13-20-00450-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

NOLAN DEWAYNE THOMPKINS,                                    Appellant,

v.

THE STATE OF TEXAS,                                         Appellee.

## On appeal from the 54th District Court
## of McLennan County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Silva**
**Memorandum Opinion by Justice Silva**

Appellant Nolan DeWayne Thompkins raises a single issue challenging the trial

court's denial of his request for post-conviction DNA testing pursuant to Chapter 64 of the

Texas Code of Criminal Procedure.[1] *See* TEX. CODE CRIM. PROC. ANN. arts. 64.01–.03. We affirm.

## I.     BACKGROUND

On August 7, 2013, Thompkins was indicted on three counts of sexual assault. The indictment alleged he penetrated the mouth, vagina, and anus of the complainant, T.H.[2] On November 13, 2014, a jury found Thompkins guilty on all three counts. Thompkins received a life sentence for each count. Because the parties dispute whether the identity of the perpetrator was at issue and whether any potential testing results would cast an affirmative doubt on the validity of Thompkins's conviction considering other evidence introduced at trial, we recite the pertinent facts from trial.

### A.     Trial Evidence

T.H. testified that on November 2, 2012, she walked to an unspecified location to buy a "$5 hit of crack" and smoked it there. Upon nightfall, T.H. accepted a ride home from an acquaintance's drug dealer. T.H. did not know his name. T.H. testified that the dealer stopped at an apartment complex, and T.H. accompanied him inside the apartment because she needed to use the restroom. T.H. exited the restroom and realized that she was alone in the apartment with a man later identified as Thompkins. T.H. testified that Thompkins was a stranger to her. When T.H. attempted to use her cell phone to call a friend for a ride home, Thompkins took her cell phone and said that "he would kill [her]" if

---

[1] This appeal was transferred from the Tenth Court of Appeals in Waco pursuant to a docket-equalization order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 74.001.

[2] Although the complainant's identity was not concealed at trial, we use only her initials here to protect her identity. *See* TEX. R. APP. P. 9.8 cmt. ("The rule does not limit an appellate court's authority to disguise parties' identities in appropriate circumstances in other cases."); *see also, e.g.*, *Jaycox v. State*, No. 13-13-00639-CR, 2015 WL 5233200, at *1 (Tex. App.—Corpus Christi–Edinburg Sept. 3, 2015, no pet.) (mem. op., not designated for publication).

she did not have sexual intercourse with him. T.H. testified that Thompkins penetrated her orally, vaginally, and anally, and the encounter persisted "on and off for hours" with Thompkins occasionally stopping to "take . . . a hit of crack." T.H. testified she initially "tried to fight," but Thompkins responded by putting his "hand over [her] mouth and around [her] neck" and threatening to "kill [her] if [she] didn't shut up." After Thompkins fell asleep, T.H. found her cell phone, got dressed, and left the apartment. T.H. testified that her roommate picked her up, and she called 9-1-1 after she arrived home.

Kerry Cantu, a police officer with the Beverly Hills Police Department, confirmed that T.H. called police around 9:42 a.m. on November 3, 2012. Cantu made contact with T.H. at the hospital, where she was undergoing a sexual assault examination. Although T.H. did not know the name of her assailant, she was able to provide information concerning the general location of the apartment where the assault occurred and a description of her attacker. Cantu later determined that Thompkins resided in the apartment in question. T.H. identified Thompkins in a photograph lineup about one week later.

Michele Davis, a sexual assault nurse examiner, testified that she performed the sexual assault examination on T.H. at approximately 11:30 a.m. on November 3, 2012. Davis testified that T.H. appeared disheveled, wore torn, dirty clothes, and had "debris" in her hair. Davis observed "a lot of redness and [an] excoriation bilaterally" in T.H.'s vaginal and anal regions. Davis noted that T.H.'s vaginal area also "had a large amount of feces," which was "indicative of someone performing anal sex and then performing vaginal sex afterwards."

3

Erin Casmus, a forensic scientist with the Texas Department of Public Safety Crime Laboratory in Waco, testified that two reports were issued in this case. The first report only noted that no semen was detected from the vaginal and anal swabs collected during the sexual assault examination. The supplemental DNA report testing skin cells from the vaginal swab indicated the swab contained a "single source" DNA belonging to T.H. The anal swab test results indicated a "mixture" of DNA sources were present, but Thompkins was excluded as a contributor.

At the State's request, Casmus then did Y-STR[3] testing on the vaginal and anal swabs. Casmus "obtained a partial Y-STR profile" from the vaginal and anal swabs and determined that "Thompkins could not be excluded as the contributor" of either profile. Casmus, however, noted that the Y-STR DNA contribution database contained approximately 20,000 sources for comparison, and because the Y-STR profile contained low amounts of DNA, several thousand unknown others also shared the contribution profiles found in vaginal and anal swabs tested.

Two unrelated complainants from prior sexual assault offenses involving Thompkins also testified: A.C. and T.M. A.C. testified she was homeless when she met Thompkins on October 27, 2012. A.C. said, "[Thompkins] just started talking to me . . . [and] asked me if I wanted to go to his apartment with him and hang out for a little while." Although she did not know Thompkins, A.C. said she accepted his invitation after he offered to do drugs with her. A.C. testified that Thompkins asked her to have sex with him once they were at his apartment and told her "that if [she] didn't[,] he would beat the

_____

[3] Casmus explained that Y-STRs are taken specifically from the male Y chromosome and analyzed against an available sample for forensic comparisons. Y-STR stands for a short tandem repeat on the Y-chromosome.

shit out of [her]." A.C. stated that Thompkins forcefully had vaginal and anal intercourse with her for "[h]ours," and she escaped by using Thompkins's phone to call 9-1-1 under the guise of calling a drug dealer.[4] A.C. testified that, when police arrived, she ran out half-naked and hugged the officer. A.C. said she was ultimately arrested for possession of paraphernalia. The officer, Lester Williams Jr., testified he arrested both A.C. and Thompkins that morning, and he recalled A.C. being "very happy to go to jail." According to Williams, "[S]he just wanted to be out of there."

T.M. testified she met Thompkins on May 11, 2013, when she was "smoking crack" with a friend, and "he offered to go hang out and get high." Thompkins took her to a church, where it appeared he was living. T.M. testified that after the two did drugs, Thompkins propositioned her for sex, and she declined. T.M. testified, "[Thompkins] pretty much told me that—what I was going to do[,] and if I chose not to[,] what the consequences were going to be. . . . He'd break my neck or blow my head off." T.M. testified that Thompkins took her phone away and forcefully penetrated her vaginally and anally "for hours." When Thompkins "passed out," T.M. "grabbed a sheet and ran." T.M. flagged down a vehicle in the early morning hours, and a passenger in the vehicle called 9-1-1. Teresa Pankonien performed the sexual assault examination on T.M. Pankonien testified at trial that she noted T.M. had sustained "acute genital injuries."

Thompkins testified that T.H., A.C., and T.M. were all prostitutes and denied sexually assaulting any of them. Thompkins said he used to spend his weekends high on crack cocaine in the company of prostitutes. When asked by his trial counsel what effect, if any, his drug use has had on him, Thompkins responded: "It makes me paranoid. I hear

---

[4] The 9-1-1 call recordings were admitted into evidence.

things, think things are coming, things are going to happen. Sometimes it gives you the impression that you want to have sex."

Thompkins testified that he had gone to a motel looking for a prostitute when he met T.H. on November 2, 2012, and she had just been "with another trick." Thompkins testified that he and T.H. went back to his apartment, smoked, "watched pornos," drank alcohol, played cards, and talked about her "job history" and children until 3 a.m., when they fell asleep "in the same bed, side by side, dressed." Thompkins explained he had been too tired to have sex. According to Thompkins, after the two woke up the next morning, T.H. was worried that she would be late for work, so he tried arranging a ride for her. Thompkins said he ended up walking her out and was with her until around 10 a.m., when he returned to his apartment.

Regarding A.C., Thompkins testified that "she agreed to spend the night in exchange for drugs." Thompkins stated he and A.C. never had sex although they "attempted to have sex a couple of times, but these [sic] were attempts to steal [his] items, get [his] clothes off so she could get [his], you know, stereo . . . ." Thompkins was unable to explain why he and A.C. were unclothed when police arrived.

Thompkins maintained that of the three women accusing him of sexual assault, he only had sex with T.M., and it had been consensual. When questioned about whether his drug usage could have affected his perception of his interactions with T.H., A.C., and T.M., Thompkins responded:

> Because it triggers you to thinking that this is what you want to do. I've just always been comfortable in the presence of a woman. I've heard some horrible stories, guys being together, homosexual activity. That stuff just don't [sic] interest me. So I just—it's just I've always been comfortable being with a woman. But it's never always a sexual thing. I just don't perform when I'm on it sexually. It just never happened. If I don't do it before, then it's just

6

not going to happen. And I've never preyed upon anybody or used drugs to try to take advantage of anybody . . . .

During cross-examination, Thompkins acquiesced to the existence of several other sexual assault allegations involving different complainants in 2002 and 2006, and three prior domestic violence assault convictions involving three separate complainants—"One was a friend, one was a cousin, one was a girlfriend."

Thompkins called three witnesses to testify for his case-in-chief: Curtis Cole, Jermaine Anderson, and Dinesha Anderson. Cole, the father of one of T.H.'s children, briefly testified that T.H.'s reputation was "no good." The Andersons testified they had picked up Thompkins and an unknown female and dropped them off at Thompkins's apartment on the evening in question. Jermaine testified he thought Thompkins and the woman "were together," and the woman inexplicably got his number and proceeded to call him "constantly" all night up until "7:00 or 8:00 that morning."[5] In one particular voicemail left that evening, the Andersons testified they could hear what sounded like two people having sex. Dinesha testified that the voicemail call came from Thompkins's cell phone number.

The jury returned a guilty verdict.

## B.    Post-Conviction Matters

Thompkins appealed his conviction, and on January 7, 2016, our sister court issued a memorandum opinion, affirming the trial court's judgment. *Thompkins v. State*,

---

[5] During Thompkins's testimony, he identified Jermaine as a coworker and "dope" seller. Thompkins testified that he called Jermaine several times throughout the day and evening "trying to get his [sic] dope" and said that he recalled T.H. calling Jermaine too when she was looking to get a ride back home.

No. 10-14-00363-CR, 2016 WL 102851, at *1 (Tex. App.—Waco Jan. 7, 2016, pet. ref'd) (mem. op., not designated for publication).

On June 29, 2020, Thompkins filed his motion for DNA testing under Chapter 64, seeking the "reexamination of the complete sexual assault ki[t]." *See* TEX. CODE CRIM. PROC. ANN. arts. 64.01–.03. Thompkins contended that (1) the evidence remains testable, uncompromised, and in the possession of the district clerk's office; (2) the perpetrator's identity is at issue in this case; and (3) although "DPS determined that there was not were [sic] large enough samples obtained to create a full DNA profile and match [Thompkins]," "a more sensitive test will establish the identity of another perpetrator." The State countered that identity was not an issue in this case because Thompkins conceded to being with T.H. on the evening the offense occurred; the presence of another individual's DNA would not exclude Thompkins as a perpetrator in this offense; and a jury had convicted Thompkins despite the State's undisputedly "weak" DNA evidence.

On September 24, 2020, a hearing was held on Thompkins's Chapter 64 motion. The State and Thompkins's counsel appeared via teleconference. Thompkins was not in attendance, and no witnesses were called. The trial court denied Thompkins's motion without making any written findings. This appeal followed.

## II.    DISCUSSION

There exists "no free-standing due-process right to DNA testing." *Ramirez v. State*, 621 S.W.3d 711, 717–18 (Tex. Crim. App. 2021) (citing *Ex parte Gutierrez*, 337 S.W.3d 883, 889 (Tex. Crim. App. 2011)). Rather, Chapter 64 of the Texas Code of Criminal Procedure provides that a convicted person may submit a motion to the convicting court to obtain post-conviction DNA testing, and a convicting court may order forensic DNA

testing only if the statutory preconditions of Chapter 64 are met. TEX. CODE CRIM. PROC. ANN. art. 64.01; *Ex parte Gutierrez*, 337 S.W.3d at 889. Pursuant to Chapter 64, the convicting court must order DNA testing if the court finds that:

1. the evidence still exists and is in a condition making DNA testing possible;

2. the evidence has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;

3. there is a reasonable likelihood that the evidence contains biological material suitable for DNA testing; and

4. identity was or is an issue in the case.

*Ex parte Gutierrez*, 337 S.W.3d at 889 (quoting TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(1) (cleaned up)). Additionally, the convicted person must establish by a preponderance of the evidence that: (1) he "would not have been convicted if exculpatory results had been obtained through DNA testing; and" (2) "the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice." TEX. CODE CRIM. PROC. ANN. art. 64.03(2)(A), (B); *State v. Swearingen*, 424 S.W.3d 32, 36 (Tex. Crim. App. 2014). "[T]he appellant must show that, more likely than not, []he would not have been convicted had the jury been able to weigh evidence that []he did *not* deposit biological material on the [complainant] against the balance of the evidence presented at trial." *Holberg v. State*, 425 S.W.3d 282, 287 (Tex. Crim. App. 2014). "The required showing has not been made if exculpatory test results would 'merely muddy the waters.'" *LaRue v. State*, 518 S.W.3d 439, 446 (Tex. Crim. App. 2017) (quoting *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002)).

Generally, in reviewing a trial court's ruling on a Chapter 64 motion, we give almost total deference to the trial court's "resolution of historical fact issues supported by the

9

record and application-of-law-to-fact issues turning on witness credibility and demeanor" and "consider de novo all other application-of-law-to-fact questions." *Ramirez*, 621 S.W.3d at 718. Where, as here, there are no findings of fact or conclusions of law from this DNA proceeding in the record, we infer findings necessary to support the trial court's ruling so long as they are reasonably supported by the record. *Dunning v. State*, 572 S.W.3d 685, 692 (Tex. Crim. App. 2019); *see also Nious v. State*, No. 13-17-00482-CR, 2018 WL 6815496, at *2 (Tex. App.—Corpus Christi–Edinburg Dec. 27, 2018, no pet.) (mem. op., not designated for publication).

Both Thompkins and the State discuss the applicability of *Blacklock v. State*, 235 S.W.3d 231, 233 (Tex. Crim. App. 2007) and *Esparza v. State*, 282 S.W.3d 913, 922 (Tex. Crim. App. 2009) at length in their respective briefs. In *Esparza* and *Blacklock*, the Texas Court of Criminal Appeals held that the appellant's motion for DNA testing sufficiently showed that identity had been at issue in their respective cases and that exculpatory DNA tests would prove their innocence. *Esparza*, 282 S.W.3d at 922; *Blacklock*, 235 S.W.3d at 233. In *Blacklock*, the court observed that "DNA testing of semen from the victim's vaginal smears was inconclusive," and the appellant had alleged in his Chapter 64 motion that there was "no indication . . . that [the State] tested the semen" found on the complainant's pants and underwear. *Blacklock*, 235 S.W.3d at 232 (alteration in original). The court concluded that, given these facts, whether "the victim testified that she knew appellant and identified him as her attacker is irrelevant to whether appellant's motion for DNA testing makes his identity an issue" and ordered additional testing. *Id.* at 233.

10

"Adhering to *Blacklock*," the court in *Esparza* determined that Esparza had sufficiently showed identity was at issue because the "record establishes that [complainant's] attacker deposited semen or seminal fluid inside [the complainant] during the assault"; there was testimony that "semen was found on the swab but that it was inconclusive"; and there was no contrary evidence to "support the conclusion that DNA evidence recovered from [the complainant] would belong to someone other than Esparza." *Esparza*, 282 S.W.3d at 917, 921–22.

The facts before us differ from those before the court in *Esparza* and *Blacklock*. *See Esparza*, 282 S.W.3d at 922; *Blacklock*, 235 S.W.3d at 233. Here, there was no evidence presented that Thompkins ejaculated, semen was not observed during T.H.'s examination,[6] and there was no semen or seminal fluid detected in either of the smears collected; therefore, unlike in *Esparza* and *Blacklock*, there is no semen to test and exclude Thompkins as a source from. *See Holberg*, 425 S.W.3d at 287; *cf. Esparza*, 282 S.W.3d at 922; *Blacklock*, 235 S.W.3d at 233.

The only biological material recovered here were skin cells, and more notably, the results of testing those cells indicated the presence of other contributors. The initial testing of the vaginal swab produced a "single source DNA profile," which was "consistent with the DNA profile of [T.H.]," and the anal swab produced a "partial DNA profile" that was "consistent with a mixture"—from which Thompkins was excluded as a contributor. Casmus testified that she could "see that there is probably someone else in that [anal

---

[6] Davis testified that T.H. refused the speculum vaginal examination, citing excess pain, so Davis was unable to examine T.H.'s "fossa navicularis," which Davis described as a "little cup inside" of the vagina that "usually holds a[]lot [of] semen if they've ejaculated." Davis made no note regarding a presence of semen otherwise.

11

swab] sample," but the "low level of data present" precluded further comparison testing. Following additional testing, wherein the isolated DNA was analyzed using Y-STR testing, Thompkins was no longer able to be excluded as a possible DNA profile contributor. Even so, Casmus opined that the statistical link was weak because "[m]ore people could potentially be the contributor." Casmus explained that the Y-STR database contained approximately "20,000 [contribution] samples," and the vaginal swab results indicated "the selected profile is found in 1,880 of 28,088 total individuals within the database." Similarly, though Thompkins could not be excluded as a contributor from the anal swab tested, the selected profile detected was "found in 11,536 of 28,367 total individuals within the database."

Unlike the juries in *Esparza* and *Blacklock*, the trier of fact here was already presented with DNA evidence that potentially exculpated Thompkins and rejected it. *Cf. Esparza*, 282 S.W.3d at 922; *Blacklock*, 235 S.W.3d at 233; *see Swearingen*, 424 S.W.3d at 39 (affirming the trial court's denial of a Chapter 64 request because "the jury already was aware that an unidentified male's DNA was found under the victim's fingernails" and "disregarded" the results, so there was "no reason to believe that it would be any different" following additional testing); *see generally Dist. Atty's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 80–81 (2009) (Alito, J., concurring) ("DNA testing—even when performed with modern STR technology, and even when performed in perfect accordance with protocols—often fails to provide 'absolute proof' of anything.").

Thus, we are unconvinced that additional testing of the skin cells yielding the presence of another DNA donor would overcome the substantial evidence of Thompkins's guilt. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03(2)(A) (requiring that the convicted

12

person establish by a preponderance of the evidence that he "would not have been convicted if exculpatory results had been obtained through DNA testing"); *Swearingen v. State*, 303 S.W.3d 728, 736 (Tex. Crim. App. 2010) ("Texas courts have consistently held that a movant does not satisfy his burden under Article 64.03 if the record contains other substantial evidence of guilt independent of that for which the movant seeks DNA testing."); *Bell v. State*, 90 S.W.3d 301, 306 (Tex. Crim. App. 2002) (concluding that appellant's "bare assertion that the biological samples in question might belong to someone else" was "not enough" to constitute affirmative evidence of appellant's innocence). The evidence indicating guilt independent of the State's DNA evidence included: (1) T.H.'s testimony that Thompkins had sexually assaulted her; (2) Thompkins's testimony that he had sought prostitution services from T.H. on the evening of the alleged assault and that he had been with her for the entire evening; (3) Thompkins's two witnesses testifying that they heard a voicemail comprised of sex noises left by Thompkins on the same evening; and (4) Thompkins's established history of committing assaultive offenses against women. *See Swearingen*, 424 S.W.3d at 39; *see also, e.g.*, *Wilson v. State*, 185 S.W.3d 481, 485 (Tex. Crim. App. 2006) (concluding that "[e]ven if we accept the premise that identity is an issue," "there was ample evidence from a variety of sources," including appellant's "history of abduction and sexual assault" and testimony verifying his presence in the complainant's apartment complex; therefore, "the trial court did not err in denying relief"); *Flores v. State*, 491 S.W.3d 6, 10 (Tex. App.— Houston [14th Dist.] 2016, pet. ref'd) ("Even if we were to infer from the results that another person was present at the time of the shooting, this inference alone 'would not factually exclude the appell[ant] from having killed [the victim]' and would not demonstrate

13

a reasonable probability of acquittal."); *Morris v. State*, 110 S.W.3d 100, 103 (Tex. App.—Eastland 2003, pet. ref'd) (concluding identity was not an issue when appellant admitted he was with the victim at the time of alleged assault).

We conclude that the trial court's denial of Thompkins's motion for post-conviction DNA testing is supported by the record. *See Dunning*, 572 S.W.3d at 692. The trial court did not err in denying Thompkins's motion, and Thompkins's sole issue is overruled.

## III.    CONCLUSION

We affirm the trial court's order denying further DNA testing.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
26th day of August, 2021.

14