Opinion filed August 30, 2019



# In The

# Eleventh Court of Appeals

_____

## No. 11-17-00236-CR

_____

## THE STATE OF TEXAS, Appellant

## V.

## JOE D. BRYAN, Appellee

**On Appeal from the 220th District Court**

**Comanche County, Texas**

**Trial Court Cause No. 1319**

## M E M O R A N D U M   O P I N I O N

In 1985, in Bosque County, a jury convicted Appellee of the offense of murder; the victim was Appellee's wife, Mickey Blue Bryan. The Waco Court of Appeals reversed that conviction and held that the trial court erred when it refused to allow Appellee to reopen and present rebuttal testimony before jury arguments began. The Waco court remanded the case to the trial court. Subsequently, the trial court transferred venue to Comanche County.

After a lengthy trial in 1989, a Comanche County jury convicted Appellee, for the second time, of the offense of murder and assessed his punishment at confinement for 99 years and a fine of $10,000. The same trial judge who presided over the Bosque County trial also presided over the Comanche County trial. This court affirmed Appellee's Comanche County conviction in an opinion and judgment issued in 1991. *Bryan v. State*, 804 S.W.2d 648 (Tex. App.—Eastland 1991), *aff'd*, 837 S.W.2d 637 (Tex. Crim. App. 1992), *abrogated in part by Trevino v. State*, 991 S.W.2d 849 (Tex. Crim. App. 1999).

In 2011, Appellee filed a motion for postconviction DNA testing. That motion is not at issue here. In 2017, Appellee filed another motion for postconviction DNA testing under Chapter 64 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. arts. 64.01–.05 (West 2018). The same trial judge who presided over both the Bosque County trial and the Comanche County trial heard the 2017 motion for DNA testing and granted it as to each item upon which Appellee requested testing. The State has brought this appeal from that ruling. *See id.* art. 44.01(a)(6).

In a single issue on appeal, the State contends that "[t]he trial court erred in finding that Appellee established by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing of each of the items ordered to be tested." We vacate the trial court's order and remand the cause to the trial court.

There are threshold requirements that a defendant must prove before he is entitled to postconviction DNA testing. *See id.* art. 64.03. A plain reading of the State's issue on appeal reveals that the only one of those requirements that the State contests in this appeal is the one that is contained in Article 64.03(a)(2)(A). *Id.* art. 64.03(a)(2)(A). Under that provision, a movant must establish by a preponderance of the evidence that he would not have been convicted if exculpatory

results had been obtained through DNA testing. *Id.* "Exculpatory results" means results excluding the convicted person as the donor of the material. *Holberg v. State*, 425 S.W.3d 282, 287 (Tex. Crim. App. 2014). We are to presume that the results of the postconviction DNA tests would be favorable to the defendant. *Routier v. State*, 273 S.W.3d 241, 257 (Tex. Crim. App. 2008). "A 'favorable' DNA test result must be the sort of evidence that would affirmatively cast doubt upon the validity of the inmate's conviction; otherwise, DNA testing would simply 'muddy the waters.'" *Ex parte Gutierrez*, 337 S.W.3d 883, 892 (Tex. Crim. App. 2011) (citing *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002)). A convicted person is not entitled to DNA testing unless he first shows that there is a greater than 50% probability that he would not have been convicted if the presumed exculpatory results had been available at the time of his trial. *Holberg*, 425 S.W.3d at 286–87.

In our review of the trial court's ruling in this case, we are to give almost total deference to the trial court's findings of historical fact and application-of-law-to-fact issues that turn on witness credibility and demeanor. *See Gutierrez*, 337 S.W.3d at 890; *Routier*, 273 S.W.3d at 246. But we review de novo all other issues applying law to fact. *Gutierrez*, 337 S.W.3d at 890; *Routier*, 273 S.W.3d at 246. The de novo review includes the issue of whether the convicted person has established by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing. *Rivera*, 89 S.W.3d at 59; *see* CRIM. PROC. art. 64.03(a)(2)(A).

The State has taken the position that, in our review, we cannot consider the trial record from the Comanche County conviction because it was not offered as a part of the record in the DNA hearing in the trial court. When we review a trial court's ruling on a postconviction DNA motion, we may take judicial notice of the contents of our file in the direct appeal of the conviction. *Ware v. State*, No. 01-03-00073-CR, 2004 WL 440425, at *1 n.1 (Tex. App.—Houston [1st Dist.] Mar. 11,

2004, no pet.) (mem. op., not designated for publication); *see also Turner v. State*, 733 S.W.2d 218, 223 (Tex. Crim. App. 1987) (an appellate court may take judicial notice of its own records in the same or related proceedings involving the same or nearly the same parties)

Further, insofar as the State's challenge to the evidence available to the trial court is concerned, the same trial judge had twice tried this same case. In fact, when the State questioned whether the trial court had an adequate record upon which it could rule on the motion, the trial judge made the statement: "I tried it twice. I'm fairly familiar with it." As the court said in *Jacobs*, "the trial court would have before it the court's entire file when ruling on [the] motion for post-conviction DNA testing. Because this case had been previously appealed, the trial court had access to testimony in the reporter's record." *Jacobs v. State*, 115 S.W.3d 108, 112 (Tex. App.—Texarkana 2003, pet. ref'd). The State's challenge to the sufficiency of the record, either before the trial court or this court, is overruled.

In the direct appeal of this case, we found that the evidence, though circumstantial, was sufficient to support the finding of the jury that Appellee murdered his wife, Mickey. *Bryan*, 804 S.W.2d at 651. In this appeal, however, the sole issue presented is whether Appellee has met his burden to show, by a preponderance of the evidence, that with the presumed exculpatory DNA test results, he would not have been convicted. The answer to that issue necessitates a review of the evidence. That is so because we are to limit our review to whether exculpatory results would "alter the landscape if added to the mix of evidence that was available at the time of trial." *Reed v. State*, 541 S.W.3d 759, 774 (Tex. Crim. App. 2017) (quoting *Holberg*, 425 S.W.3d at 285). For that review, we refer to our opinion on direct appeal of this case, to the record in that appeal, and to the record in this appeal.

Before Mickey was murdered, she was an elementary school teacher in Clifton; Appellee was the high school principal there. Appellee and Mickey had

4

been married for sixteen years, and there was no outward indication of any trouble in their marriage.

The coroner who testified at the Comanche County trial testified that Mickey was killed in the early morning hours of October 15, 1985, sometime between 12:00 a.m. and 6:00 a.m. On the afternoon of October 13, 1985, Appellee drove from his and Mickey's home in Clifton to the Hyatt Regency Hotel in Austin to attend the annual meeting of the Texas Association of Secondary School Principals (TASSP). Appellee called Mickey long distance from the hotel at 9:00 p.m. on the evening of October 14.

Around 8:00 a.m. on October 15, Mickey's body was found after she did not show up at the elementary school to teach her class; she was found on the bed in the master bedroom of the Bryans' home. An alarm clock in the room was set for 6:00 a.m., and it had not been turned off. Mickey's folded robe was found at the foot of the bed.

Mickey had been shot three times in the head and once in the stomach. The coroner testified that all four wounds indicated that Mickey had been shot at very close range, and given the extensive amount of blood throughout the room, the coroner expressed the opinion that Mickey's assailant would have been spattered with her blood. Additionally, the coroner observed that three of the gunshot wounds contained small pieces of blue-green plastic, which the coroner claimed came from "snake-shot" ammunition. The Bryans kept a .357 magnum pistol, loaded with "snake-shot," in their bedroom. Mickey's wounds were caused by small shot such as would have been fired from the .357 magnum pistol. When authorities found Mickey's body, the .357 magnum pistol was missing from the Bryans' bedroom.

Around 10:00 a.m. on October 15, someone from the TASSP convention located Appellee at a TASSP meeting and informed him of Mickey's death. Some of Appellee's acquaintances drove him back to Clifton; other acquaintances drove

5

Appellee's vehicle first to Woodway and eventually to Clifton. When Appellee arrived in Clifton, he appeared to cooperate with the investigating officers. Among other things, Appellee told investigators that there should be $1,000 in cash in a safe or file box in the bedroom. When investigators looked for the money, it was not there. Further, based on the amount of dust on the top of the file box, it did not appear that the file box had been opened recently. Appellee told investigators that the money was missing.

The next day, Appellee loaned his vehicle to Mickey's brother, Charlie Blue. Later that week, Blue found a bloody flashlight in the trunk of Appellee's vehicle and reported what he had found to Joe Willie, the Texas Ranger in charge of the investigation. The evidence at trial showed that the blood on the flashlight matched Mickey's blood and that there were small pieces of plastic on the flashlight that matched the small pieces of plastic found on Mickey's body, which came from the "snake-shot" ammunition.

Ranger Willie secured a search warrant and searched Appellee's vehicle. Ranger Willie found the bloody flashlight, among other things, in a box in the trunk of Appellee's vehicle. At the bottom of that box, there was a "crust of human blood"; Patricia Almanza, a chemist from the Texas Department of Public Safety, said that the crust of human blood was consistent with having come from the flashlight. There were also two human head hairs inside of the box that, according to Almanza, did not match either Appellee or Mickey. Neither Ranger Willie, nor anyone else who searched the vehicle, found any money.

On the same day that law enforcement officers searched Appellee's vehicle, Blue returned the vehicle to Appellee; Appellee was not specifically informed that a search warrant had been executed, although Blue left a copy of the search warrant in the trunk. The next day, Appellee told local police that he had found $850 in the

6

trunk of his vehicle. He explained that he had placed the money in the trunk two weeks before so that he could buy "shrubbery."

Local law enforcement personnel asked Appellee to give a statement about the money that he claimed he had found in his vehicle and to include anything else that Appellee felt was "important." In that statement, Appellee detailed his actions at the TASSP convention, and he also explained how the money ended up in the trunk of the vehicle that he had driven to Austin. With regard to the money, Appellee stated, "Because of the events I simply forgot that we had taken the money out of the file box." Appellee also claimed in his statement that on the night of October 14, the night before Mickey was murdered in the early morning hours of October 15, he "went to bed at approximately 11 p.m." in his hotel room in Austin.

Generally, the State's theory of the case was that Appellee had driven from Austin to Clifton, entered his home with his key, shot Mickey with the .357 magnum that was kept by their bed, cleaned himself up after getting her blood all over himself, changed clothes and shoes, and disposed of the gun and some missing jewelry. The State claims that Appellee then drove back to his hotel room in Austin in time to attend the October 15 morning session of the TASSP convention. The State presented testimony that it would take about two and one-half hours to drive the distance between Appellee's home in Clifton and the Hyatt Regency Hotel in Austin.

Although the record reflects that the stopper of the sink tested negative for human blood, and although no blood was found in the shower, the State elicited other testimony that indicated that Mickey's killer cleaned up in the master bedroom or the master bathroom of the Bryans' home. Based upon the amount of blood in the master bedroom, the officers expressed the opinion that the killer had to clean up and change clothes; otherwise, there would have been traces of blood in the hallway leading to the unlocked door and there was only one bloodstain in the hallway. The State presented expert testimony that blood spatter on the blades of the bedroom

7

ceiling fan indicated that the ceiling fan was turned on after the murder. This same expert opined that the one bloodstain in the hallway got there when the ceiling fan was turned on after the murder. Appellee did not report that any of his shirts, pants, or shoes were missing. Also, the State argued in closing argument that Appellee had been in the master bathroom, at one point, because there was a bloodstained receipt in the trash can, which, according to the State, indicated "movement in the trash can."

Additionally, the State presented evidence that a pair of Appellee's underwear was found in the bathroom trash can, that the underwear contained moist semen, and that the semen on the underwear matched the semen sample secured from Appellee. Further, Appellee gave inconsistent statements to Ranger Willie about the underwear; the State, in closing argument, relied upon Appellee's inconsistent statements as evidence of his guilt. Initially, Appellee explained to Ranger Willie that he placed the pair of underwear in the trash can on Saturday before he left for Austin because they were in "terrible shape." When Ranger Willie asked Appellee about the stains on the underwear, Appellee explained that he took a lot of vitamins and that the stains found on the underwear were from his urine because he had a leaky bladder. Ranger Willie subsequently informed Appellee that the underwear contained seminal fluid. Then, Appellee stated that the underwear that was found in the trash can was not the underwear that he put there and that the killer had taken his underwear and "put the seminal fluid in there, stuck them in the trash."

The State also argued in closing argument that no sexual assault took place and that no struggle ensued between Mickey and her killer. Although Ranger Willie initially suspected a sexual assault, he ruled out that possibility based on limited testing and examinations of biological materials from a sexual assault kit that was collected from Mickey after the murder. Almanza testified at trial that she examined and conducted limited testing of a portion of the sexual assault kit, which included

8

oral swabs/smears, vaginal swabs/smears, anal swabs/smears, and fingernail clippings; she did not examine the hand swabbing that was referred to in the evidence as hand "washings." Almanza concluded that no semen was detected on the oral swabs/smears, the vaginal swabs/smears, or the anal swabs/smears; that no foreign hairs were detected in an examination of Mickey's pubic hairs; and that blood typing of the right and left fingernail clippings showed that human blood was present. However, there was not enough blood to determine a blood type. The coroner also concluded that there was no evidence of defensive wounds, specifically on the hands or arms, but he could not "say for certain whether there was a struggle involved in this death."

Appellee testified at trial that he was in Austin at the time of Mickey's murder and that he did not kill her. Appellee suggested that, while he was staying at the Hyatt Regency, someone must have taken his keys, made copies of them, used the duplicate of the house key to enter the house, murdered Mickey, and then placed the bloody flashlight in his car to frame him. Appellee testified that a person named Jack Shaw, a Hyatt Regency security officer whom Appellee said that he met at the Hyatt Regency before Mickey's death, could have been involved in Mickey's murder. Appellee stated that Shaw approached him and asked him to help in a hotel investigation of the maids at the Hyatt Regency. According to Appellee's testimony, Shaw asked him to leave his keys, along with other valuables, in his room. We note that, in his statement to local law enforcement officers, Appellee did not mention Shaw. The State presented evidence that there was no Hyatt Regency security employee named Jack Shaw and that the Hyatt Regency would not ask a guest to participate in any investigation of hotel employees.

As we have stated, Appellee did not have possession of his vehicle for four or five days after he returned to Clifton. He seemed to suggest at trial that the flashlight and money were placed in his vehicle at some point after the murder and during the

9

time that he did not have possession of his vehicle. During the time that Blue had possession of Appellee's vehicle, Blue kept it at Blue's parents' home when it was not being used. At trial, Appellee testified that he had heard that a neighbor of Blues' parents had said that, at about 3:00 a.m. a couple of days after the murder, the neighbor saw a blue truck parked by Appellee's vehicle outside Blue's parents' home. Appellee testified that this was "significant" to him "because that could be when some of these exchanges all took place." In closing argument, defense counsel suggested that Blue could have been involved in planting the flashlight and possibly the money; yet, the defense maintained that Blue was not the murderer.

In its August 14, 2017 order for DNA testing, the trial court provided for testing of:

    A. Coin envelope right fingernail clippings (from sexual assault kit)

    B. Coin envelope left fingernail clippings (from sexual assault kit)

    C. Item 50 coin envelope containing hand swabbings (from sexual assault kit)

    D. Vaginal swabs in swab box and vaginal slides in slide box (from sexual assault kit)

    E. Anal swabs in swab box and anal slides in slide box (from sexual assault kit)

    F. Remaining oral swab in swab box and oral slides in slide box (from sexual assault kit)

    G. Public [sic] hair combings in Petri dish with unknown foreign substance

    H. Glassine envelope labeled "59 crust from bottom of box"

    I. Glassine envelope labeled "hair from bottom of the box"

    J. Labeled "16 robe from bed"; specifically, (1) front of robe near openings on each right and left side and (2) wrist cuff-areas on each side.[1]

    K. Both 1988 postmarked anonymous letters with companion envelopes (one to The Blues; the other to Andy McMullen); specifically the envelopes' seals and stamps.

L. Select hairs.[2]

[1] As to the robe, Item (J), the Court GRANTS Defendant request that each side of each area is swabbed individually (e.g. left-side opening individually swabbed, right-side wrist-cuff area individually swabbed). It is further ORDERED that Y-STR testing be conducted on each of these specific swabs.

[2] Glassine envelopes labeled "11 hair from center of bed"; labeled "19 two hair from top of white plastic bag in front of closet on S. wall"; "20 hair from trashcan in master bath"; "26 hair from bedspread near thigh area"; "35 hair from floor by bed, closet side". Transparent envelope with hairs from bedding; two slide folders of mounted hairs.

The Texas Department of Public Safety collected about 100 hair samples during the investigation. DPS concluded, with regard to the hairs collected from the master bedroom and bathroom area that were "suitable for comparison," that they all matched either Appellee or Mickey.

The two letters that the trial court ordered tests upon were sent after Appellee's first trial and before the second trial and contained the following message:

Joe Bryan did not kill Mickey Bryan.

Mickey wanted to Black-male [sic] us.

She had info on names of drug dealing in the county.

The gun is in Lake Whitney. We took the gun away from her.

She offered us everything she had to not hurt her.

I was in the house when Joe called. The others came later.

It was easy to frame Joe, he is to [sic] trusting, he is a really good person. Sorry about this, Joe, we had to take care of us.

She told me when Joe was leaving and where was staying.

Yes, Mickey had to Die!!! She was going to tell if we didn[']t pay.

Our connections wanted Joe killed while he was in prison—but we could not get it done.

We now believe that Joe doesn[']t know anything or he would tell it regardless of the cost.

Mickey's family is as greedy as she was. Shame—Shame—Shame.

We almost got caught putting the flashlight in Joe's car—plus taking the money.

Ha Ha Ha

DPS conducted handwriting analysis on the letters. However, because the writing on the letters was "uncharacteristic of natural handwriting," DPS concluded that it was unlikely "that the questioned writing submitted would be identified if suspect standard writing were obtained."

The record contains various DPS scientific reports related to posttrial testing of the evidence in this case. The additional testing and reports were either at the direction of the trial court or in response to agreements between the State and Appellee.

A June 2012 forensic biology report shows that a screen for biological evidence revealed that no semen was detected on the underwear that was found in the trash can in the bathroom. A presumptive test for blood on the flashlight and lens was negative on the lens. A June 2012 DNA report indicates that a portion of the stain from the underwear was extracted using a two-step DNA recovery method; a DNA profile was not obtained from the epithelial fraction or the sperm fraction using this method. As far as the flashlight and lens are concerned, two swabs were extracted by a method that recovers DNA from nucleated cells. The partial DNA profile that was obtained from the lens was too limited for interpretation. With regard to oral swabs from Mickey's sexual assault kit, "[a] portion of one swab was extracted by a method that recovers DNA from nucleated cells"; a DNA profile was not obtained.

The record also contains a supplemental DNA report from September 2016. That report reflects that a partial DNA profile from the lens of the flashlight was

12

interpreted as a mixture of two individuals but was inconclusive as to whether Appellee was a contributor. The report additionally reflects that a partial DNA profile obtained from the oral swabs was unsuitable for use as a reference.

The appellate record also contains a supplemental forensic biology report dated August 30, 2018, and a supplemental DNA report also dated August 30, 2018. At Appellee's request, the trial court entered an order in connection with those reports. Both the testing reflected in those reports and the order of the trial court in relation to them are dated subsequent to the trial court's order on the 2017 motion and subsequent to the notice of appeal filed in this court. The trial court's order on the 2017 motion is the only order that is the subject of this appeal. We will consider only that evidence that was before the trial court at the time that it ruled on the 2017 motion. *See Asberry v. State*, 507 S.W.3d 227, 229 (Tex. Crim. App. 2016). Therefore, we will not consider proceedings that occurred subsequent to the 2017 proceedings.

The careful trial judge in this case took a very practical approach to the DNA testing sought under the 2017 motion. In fact, in response to the State's argument, the trial judge made that very clear when he made the statement: "If we don't [find the assailant's DNA] then what's the harm? If it's not there, it's not there, and then you can slam the door on this one, can't you?"

Although the trial judge's approach was a very practical one, the question that we must ask and answer in this appeal is: Did Appellee prove that, if the results of DNA testing had been available at his trial, there was a 51% chance that he would not have been convicted of the offense of murder? *Routier*, 273 S.W.3d at 257. When we answer that question, we are to assume, without deciding, that the results of the DNA testing would be favorable to Appellee. *Id.* "A 'favorable' DNA test result must be the sort of evidence that would affirmatively cast doubt upon the validity of the inmate's conviction; otherwise, DNA testing would simply 'muddy

13

the waters.'" *Ex parte Gutierrez*, 337 S.W.3d at 892 (citing *Rivera*, 89 S.W.3d at 59). Appellee is not entitled to DNA testing unless he shows that there is a greater than 50% chance that his jury would not have convicted him if it had been aware of the presumptively favorable test results. *Holberg*, 425 S.W.3d at 286–87. In other words, an inmate must show by a preponderance of the evidence that, in light of the presumed exculpatory DNA test results, he would not have been convicted. *See Reed*, 541 S.W.3d at 774.

Appellee contends that, if DNA tests were performed on the items he wanted to have tested, those results would exonerate him as being Mickey's killer. We cannot agree with Appellee.

Even if the results of further DNA testing were to show some third party's DNA, that evidence would not be such as to exonerate Appellee. At most, the evidence would show that some person, at some time, for some reason was in Appellee and Mickey's home and that someone, somewhere, at some time handled the flashlight found in Appellee's vehicle. Neither would DNA testing of the letters and envelopes exonerate Appellee. If we assume that some third party's DNA was present on the letters and envelopes, that would show no more than that some third person wrote the letters. None of the evidence sought to be tested would mark any such third person as Mickey's killer and thereby exonerate Appellee. "DNA is durable; it does not evaporate or dissipate, and the time at which it was deposited on a surface cannot be directly determined." *Wilson v. State*, 185 S.W.3d 481, 491 (Tex. Crim. App. 2006) (Johnson, J., concurring).

Unlike the facts in *Routier* where the presumed DNA results would have placed an unknown party at the scene at the time of the murders, here, there is no way to know when any presumptive DNA might have been deposited. The presence of another DNA donor would not factually exclude Appellee as the individual who killed Mickey. *See State v. Swearingen*, 424 S.W.3d 32, 39 (Tex. Crim. App. 2014)

14

(the fact that the victim encountered another person would not factually exclude the defendant as the victim's killer); *see also Hall v. State*, 569 S.W.3d 646 (Tex. Crim. App. 2019) (the presence of a third party's DNA may not have any tendency to exonerate defendant).

Our task in this appeal is not to determine whether there is sufficient evidence to support Appellee's conviction. Rather, the issue is whether Appellee has met his burden to prove, by a preponderance of the evidence, that, had the presumptive DNA results been available at trial, he would not have been convicted. We cannot say that Appellee has met that burden. A presumptive redundant DNA profile does not sufficiently alter the evidentiary mix, in this case, to a degree that would have a strong tendency to engender a reasonable doubt as to Appellee's guilt in an average juror's mind. *See Reed*, 541 S.W.3d at 777. We sustain the State's sole issue on appeal.

We vacate the August 14, 2017 order of the trial court, by which it granted Appellee's motion for postconviction DNA testing, and remand this cause to the trial court for further proceedings consistent with this opinion.

JIM R. WRIGHT

SENIOR CHIEF JUSTICE

August 30, 2019

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[1]

Willson, J., not participating.

---

[1] Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.